HSAM INC., d/b/a HSA Mortgage Company, Appellant,

v.

Dale GATTER and Betty Gatter, Appellees.

No. 04–90–00575–CV.

Court of Appeals of Texas, San Antonio.

Aug. 28, 1991.

Rehearing Denied Aug. 28, 1991.

P. Keith O'Gorman, Dale Weyand, Michael Black, Burns & O'Gorman, San Antonio, for appellant.

Robert P. Stecher, Peter Koelling, San Antonio, for appellees.

Before CHAPA, BIERY and CARR, JJ.

1. Letter dated June 12, 1823, from Thomas Jefferson to United States Supreme Court Justice William Johnson. S. PADOVER, THE COMPLETE JEFFERSON 323 (1943).

2.

June 21, 1989

## ON APPELLEE'S MOTION FOR REHEARING

BIERY, Justice.

Appellee's motion for rehearing is denied; our opinion of July 10, 1991, is withdrawn and this opinion is substituted.

"Laws are made for men of ordinary understanding, and should, therefore, be construed by the ordinary rules of common sense. Their meaning is not to be sought for in metaphysical subtleties, which may make anything mean everything or nothing, at pleasure."[1] We are presented with the issue of whether a common sense construction of the Consumer Credit Code requires a multi-thousand dollar recovery for a potential two cent loss. HSAM, Inc., d/b/a HSA Mortgage Company, appellant, appeals from a judgment against it in the amount of $16,500.00 and in favor of Dale and Betty Gatter, appellees. By cross-point, the Gatters seek to have the judgment reformed to the amount of $80,048.40. We reverse and render judgment that the Gatters take nothing.

In March 1985, the Gatters entered into a retail installment contract for the purchase of a manufactured home. The right to receive payments under the contract was subsequently assigned to HSA Mortgage Company (HSA). The amount financed was $24,585.00 with a finance charge, the aggregate amount for the entire fifteen year term of the loan being $40,024.20. The contract provided that the Gatters would make payments of $358.94 on the first day of each month beginning May 1, 1985. A late charge of $17.95 would be due and owing for any payments not made by the fifteenth day of any particular month. In fact, the undisputed record reflects that of the fifty-six payments made by the Gatters, twenty of them, or approximately thirty percent, were late and the late charge assessed. In June 1989, the Gatters received a letter from Robert Stecher,[2] a lawyer who eventually filed suit

Re: LIMITED OFFER OF FREE LEGAL SERVICES TO TEXAS MANUFACTURED HOME OWNERS

Dear Friend:

I am a San Antonio lawyer who has been practicing law for about seven years. I have an

for the Gatters against HSA in October 1989. Approximately six weeks after receiving the attorney's letter, the Gatters requested from HSA "a payoff quote" of the total sums due and owing by the Gatters to HSA. The Gatters then filed suit, through Mr. Stecher, against HSA alleging the payoff quote to be excessive and therefore, a violation of the provisions of the Texas Consumer Credit Code. TEX.REV. CIV.STAT.ANN. art. 5069–6A (Vernon 1987).

The Gatters went to trial on their third amended original petition which alleged as a basis for recovery: (1) the breach of an agreement by HSA not to charge a late fee for the installment payment due March 1, 1989, even if the installment payment was made more than fifteen days after its due date; (2) the $71.80 reflected on the payoff quote as being owed for accrued and unpaid "late charges" was excessive; and (3) the amount reflected on the payoff quote as the outstanding balance owed for insurance on the manufactured home was excessive.

HSA went to trial on its first amended original answer which contained, in addition to other defensive matters: (1) a specific denial of any agreement to waive the March 1989 late charge; (2) a specific deni-

al that the $71.80 stated as the amount owing for accrued and unpaid "late charges" was excessive; (3) an affirmative defense that the financing of the insurance for the manufactured home was not regulated by TEX.REV.CIV.STAT.ANN. art. 5069–6A; (4) an affirmative defense that the payoff quote given to plaintiffs was less than the maximum amount which could have been stated pursuant to the terms of the retail installment contract and the Texas Credit Code; and (5) an affirmative defense that principles of equity precluded any recovery by the Gatters. HSA's equitable defenses specifically included the doctrines of *de minimis non curat lex* and "unclean hands."

Following presentation of evidence to the jury and a stipulation by counsel for HSA that the undated payoff quote in August of 1989 contained an assessment of a $17.95 late charge for the August 1989 installment, the trial judge submitted only two questions to the jury.[3] Trial counsel Stecher requested additional questions based upon the plaintiffs' other theories of recovery. The trial judge refused to submit these questions; the Gatters do not complain of such refusal on appeal.

Following the verdict, the trial judge denied the Gatters' motion for judgment for

---

offer of free legal services to make to all owners of manufactured homes in Bexar County, which will be effective for the next thirty (30) days only.

Your rights as a consumer are very important. It has come to my attention that some banks and finance companies may be *over charging* manufactured homeowners on their monthly home payments. Under certain provisions of Texas law, a home owner may be able to recover many thousands of dollars (twice his/her contracted interest) and attorney's fees if there are certain over charges.

I am offering to review your loan and financing documents for free. I will tell you whether, in my opinion, your rights may have been injured. Even if you do not call me, I encourage you to contact an attorney of your choice to make sure you are being treated right when it comes to your home payments.

TELL YOUR FRIENDS about my offer. If you know someone that has had their manufactured home taken by the bank, please tell them of this offer. They have important rights they need to know about.

Call my telephone recorder at (512) 590–3050 24–hours a day and leave your name and tele-

phone number, or call my office at 829–8900 and leave your name and number. You may also send copies of your loan documents to me at the above addresses. LET'S HEAR FROM YOU SOON.

I am not board certified for any legal specialty by any Texas Board of legal specialty.

Sincerely,
Robert P. Stecher

3. The questions and the jury's answers are as follows:

Question No. 1:
On what date do you find by a preponderance of the evidence that the payoff quote was given by the Defendant to the Plaintiffs?
Answer:
On or about August 12, 1989.
Question No 2:
Do you find from a preponderance of the evidence that the Plaintiffs solicited the payoff quote from the Defendant for the purpose of creating a cause of action against the Defendant? Answer Yes or No.
Answer:
Yes.

the full amount of the statutory forfeiture of $80,048.40 under TEX.REV.CIV.STAT. ANN. art. 5069–8.01(a) (Vernon 1987). The trial judge did award the Gatters judgment for $16,500.00, apparently reducing the statutory forfeiture amount because of the jury's answer to question two and HSA's equitable defenses.

The evidence reflects that Mrs. Gatter testified she received the free legal services offer from Mr. Stecher prior to the time of requesting the payoff quote. She also admitted that two late charges were owed by the Gatters to HSA, including a late charge for the August 1989 payment. Mrs. Gatter stated she received the payoff quote from HSA on August 12, 1989, five days before a late charge could lawfully be assessed for the August 1989 payment. Julie Brown, an employee of HSA, testified she prepared the payoff quote on August 23, 1989, and the information in the payoff quote was good as of August 23, 1989, although the actual payoff quote form stated the amount was "good through" August 23, 1989. HSA contends, therefore, that the August 1989 late charge was lawfully assessed after August 16, 1989, based upon Ms. Brown's testimony. The payoff quote form itself was not dated, and the Gatters did not retain the postmarked envelope in which the quote was sent. Thus, the Gatters' cause of action can be distilled to a conflict in testimony between Mrs. Gatter and Ms. Brown over when the payoff quote was given. If, in fact, the payoff quote was given after August 16, 1989, there is no dispute that it was lawfully assessed. The jury, however, resolved the conflict in testimony in favor of the Gatters. The Gatters therefore contend they are entitled to $80,048.40 in statutory penalties because the jury found the payoff quote was given on August 12, 1989, five days early.

■ We first address HSA's contention that the payoff quote is not a "charging" under Chapter 8 of the Texas Consumer Credit Code. While we agree with HSA that *Danziger v. San Jacinto Savings Ass'n*, 732 S.W.2d 300 (Tex.1987), is distinguishable on its facts from the present case, we believe the supreme court clearly

addressed the legal issue when it said that "a pay-off quote which reflects a charge of interest in excess of that allowed by law constitutes a 'charging' of usurious interest." *Danziger*, 732 S.W.2d at 304. Points of error one and two are overruled.

We next address HSA's equitable arguments that the Gatters are not entitled to judgment because the jury found the payoff quote was requested for the purpose of creating a cause of action and more specifically, the doctrine of *de minimis non curat lex*.

■ Equitable defenses are available in cases brought pursuant to the provisions of the Texas Consumer Credit Code. *Yates Ford, Inc. v. Ramirez*, 692 S.W.2d 51 (Tex. 1985) (monthly overcharge of $.002 and $.074 spread over 42 months held *de minimis*); *General Elec. Credit Corp. v. Smail*, 584 S.W.2d 690 (Tex.1979) (court found parties *in pari delicto* and award of damages an unjustifiable windfall); *Gawlik v. Padre Staples Auto Mart, Inc.*, 666 S.W.2d 161 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.) (overcharge of $1.62 did not warrant recovery under Credit Code, overcharge *de minimis*); *Wayne Strand Pontiac-GMC v. Molina*, 653 S.W.2d 45 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.) ($5.53 overcharge and charging of $2.50 official fee were *de minimis*; doctrine applicable to miscalculated or unauthorized overcharges); *Starness v. Guaranty Bank*, 634 S.W.2d 325 (Tex. App.—Dallas 1982, writ ref'd n.r.e.) ($0.21 a month excess equalling $7.56 excess over life of loan *de minimis*); *Thornhill v. Sharpstown Dodge Sales, Inc.*, 546 S.W.2d 151 (Tex.Civ.App.—Beaumont 1976, no writ) (no recovery when $0.42 overcharge used to get into court).

Mrs. Gatter admitted that the August 1989 payment, which became the only issue in the case submitted to the jury, was in fact late. Her admission is corroborated by the Gatters' canceled check which shows it was prepared by the Gatters on August 23, 1989, and in fact, included the late payment amount. The evidence also shows that the August 1989 late payment was only one of twenty late payments out of

fifty-six payments made during the credit relationship between the Gatters and HSA.

■ The Gatters have cited us to portions of the Declarations of Legislative Intent of the Texas Consumer Credit Code:

(1) Many citizens of our State are being victimized and abused in various types of credit and cash transactions ...

(3) [P]enalties imposed for usury do not provide effective or workable safeguards ...

(4) These unregulated practices bring great social and economic hardship to many citizens of our State. They impose intolerable burdens on those segments of our society which can least afford to bear them—the uneducated, the unsophisticated, the poor and the elderly.

(5) These facts conclusively indicate a need for a comprehensive code of legislation to clearly define interest and usury, ... and to provide firm and effective penalties for usury and other prohibited practices.

14D TEX.REV.CIV.STAT.ANN., TITLE 79, § 1, pp. 1–2 (Vernon 1987). We agree with the Gatters that the Texas Consumer Credit Code is a proper manifestation of the declared legislative intent. We are troubled, however, by what appears to be a hypertechnical perversion of legislative intent, an exaltation of form over substance, and a misallocation of social and judicial resources. We find absolutely no evidence in the record to suggest that HSA was the proverbial loan shark which victimized and abused the Gatters nor any evidence which suggests that HSA engaged in unscrupulous practices in its relationship with the Gatters or imposed any social or economic hardship upon them. To the contrary, the evidence supports the argument that HSA was "set up" to commit a technical violation in order to create a cause of action. Given the technology now available in the area of computer assisted telephone dialing, a logical extension of the creation of this cause of action would allow random calls to lenders with requests for payoff quotes in the hope that a deputy assistant clerical person would give an erroneous amount thereby triggering the severe penalties of the Texas Consumer Credit Code. The mere statement of the proposition demonstrates its lack of merit. We believe the fair and rational enforcement of the Texas Consumer Credit Code and other well-intentioned statutory schemes should be grounded on the firm foundation of the common law: common sense, reasonableness, and wisdom.[4] In yielding to a tendency to

---

**4.** The law is called upon to act as arbiter when conflicts arise. The administration of the laws becomes a process of weighing the interests between the plaintiff and defendant. Its primary purpose is "to make a fair adjustment of the conflicting claims of the litigating parties." *See* W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 3 (5th ed. 1984). While specifically applicable to tort law, see generally W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 32 (5th ed. 1984) (discussion of the reasonable man).

Blackstone wrote that the fairest and most rational method of interpreting the will of the legislator is to explore the intentions at the time the law was made. 1 BLACKSTONE, COMMENTARIES 59 (Dawsons of Pall Mall London 1966). The intentions may be discovered by the words, the context, the subject matter, the effects and consequences, or the *spirit* and *reason* of the law. The most universal and effectual way of discovering the true meaning of a law is by considering its reason and spirit. For exam-

ple, there was a law that those who abandoned ship would forfeit all property, and the ship would belong entirely to those who stayed with it. During a storm, all the mariners abandoned ship except one sick passenger who could not escape because of his disease. After the ship made it safely back to port, the sick man claimed possession under the law. All agreed that the sick man was not within the reason of the law because the reason for the law was to encourage the shipman to save the ship. The sick man never pretended to have stayed aboard *to save the ship* or to have contributed in any manner to its preservation. *Id.* at 61. (Emphasis added.)

Likewise, if the effects and consequences of a law bring about an absurd result, we must deviate from its perceived interpretation. *Id.* at 60. Thus, the Bolognian law which stated "that whoever drew blood in the streets should be punished with the utmost severity," was not applicable to a surgeon who opened the vein of a person who fell ill in the street. *Id.* Laws in all cases cannot be foreseen or expressed. When the application of the law to a particular case

make complex that which is simple, we sometimes overlook our history and the rudimentary principles which gave enlightened birth to our peaceful system of resolving disputes.[5] A fundamental teaching of those common law principles of reasonableness, wisdom, and common sense is the doctrine of *de minimus non curat lex.* The doctrine advocates the proposition that the law does not care for, or take notice of, very small or trifling matters. *Anguiano v. Jim Walter Homes, Inc.,* 561 S.W.2d 249, 255 (Tex.Civ.App.—San Antonio 1978, writ ref'd n.r.e.). In a misplaced zeal to create litigation, some have lost sight of the true and majestic purpose of the law to strike a reasonable balance and to do justice.

While the Gatters contend, and we agree, that $17.95 multiplied by the thousands of contracts which lenders such as HSA service is not necessarily a *de minimis* amount, that is not the issue before us. Rather, the issue is what harm, victimization, abuse, or economic hardship has been suffered by the Gatters, given the jury finding that the payoff quote was received on or about August 12, 1989, five days before the August late payment could have been lawfully assessed. Considering the undisputed fact that the August 1989 payment was in fact made late (August 23, 1989), one way of analyzing any *potential* harm to the Gatters is to inquire how much they would have lost even *if* they had paid the undisputedly owed $17.95 five days before it could have been legally assessed. At ten percent interest, the hypothetical loss of the use of the money would have been a little over two cents for the five day period. We hold the record before us, particularly the jury's verdict that the payoff quote was requested for the purpose of creating a cause of action, supports the application of the equitable doctrine of *de minimis non curat lex.*[6]

The judgment of the trial court is reversed, and judgment is rendered that the Gatters take nothing.

---

brings about circumstances which the legislator would have excepted if they had been foreseen, it is necessary that a power somewhere should be vested with excepting those circumstances from the law. *Id.* at 61.

5. Although a great many rules are explained by their "manifest good sense," some rules may only be understood by reviewing the history from which they came. O.W. HOLMES, THE COMMON LAW 2 (1881). It is common knowledge that the early forms of legal procedure were based upon vengeance. *Id.* "The courts were interested primarily in keeping the peace between individuals by providing a substitute for private vengeance." W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 4 (5th ed. 1984).

6. The equitable rule of "unclean hands" is normally used as a defense against a party seeking affirmative equitable relief and hence, has no direct applicability here. However, the jury's answer to question two clearly supports the notion that the Gatters did not come before the court clothed in pristine innocence.