**Brian BOX, Appellant,**

v.

**Riley FLYNN, Appellee.**

**No. 04–93–00300–CV.**

Court of Appeals of Texas,
San Antonio.

Dec. 22, 1993.

Peter Koelling, Peter M. Koelling, P.C. and Demetra Koelling, Koelling & Koelling, P.C., San Antonio, for appellant.

Steven R. Saindon, San Antonio, for appellee.

Before CHAPA, C.J., and RICKHOFF, J., and GERALD T. BISSETT, Assigned Justice.

## OPINION

GERALD T. BISSETT, Assigned Justice [1].

This case involves alleged violations of the Texas Talent Agency Act and the Deceptive Trade Practices Act.

Brian Box, plaintiff in the trial court (hereafter "Box"), appeals from a judgment in favor of Riley Flynn, defendant in the trial court (hereafter "Flynn"). We affirm.

Box filed his second amended original petition, his trial pleading, on November 20, 1992. He alleged conversion by Flynn of a pair of boots and several paychecks issued by "Irish Production" to him, fraud, and deceptive trade practices in violation of Tex.Rev. Civ.Stat.Ann. art. 5221a–9 § 13(b) ("DTPA").

Flynn filed his first amended answer and counterclaim on November 20, 1992, which consisted of a general denial and several affirmative defenses, to wit: 1) a plea of payment of the paychecks which Box alleged were converted by Flynn; 2) a breach of contract for the fair rental value of Flynn's house and equipment for each day that Box worked pursuant to the agreement between Flynn and Box; 3) conversion of a footlocker valued at $50; and 4) fraud. In connection with the suit for fraud, Flynn sought "damages far in excess of the jurisdictional limits of this Court" for such fraud. He further asked for attorney's fees, court costs and interest. On November 30, 1992, the trial

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to Tex.Gov't Code Ann. § 74.003(b) (Vernon 1988).

court permitted Flynn to file a trial amendment to his first amended original answer and counterclaim by filing his second amended original answer and counterclaim, his trial pleading. The allegations in the trial amendment were, in substance, the same allegations contained in his first amended original answer and counterclaim; except that in the trial amendment Flynn alleged that he sought "damages in an amount within the jurisdictional limits of the Court."

Trial to a jury began on December 1, 1992. The jury found: 1) Flynn did not commit fraud against Box; 2) Flynn converted the paychecks and the boots (belonging to Box); 3) Flynn, when he converted Box's property, did not act with malice; 4) Flynn did not engage in any false, misleading or deceptive act or practice that was a producing cause of damage to Box; 5) Flynn did not engage in any unconscionable action or cause of action that was a producing cause of damage to Box; 6) $567.37, if paid now in cash would fairly and reasonably compensate Box for his damage that resulted from the conduct of Flynn; 7) Flynn and Box agreed that Box would receive $200 per day for each day he worked on the movie set, and that Box would pay Flynn from the $200, $90 as rental for horse, tack and necessary costume articles; 8) Box failed to comply with the agreement; 9) Flynn substantially relied to his detriment on Box's promise to travel to Montana and participate in the movie, which reliance was foreseeable by Box; 10) Flynn performed compensable work for Box; 11) Box did not commit conversion against Flynn; 12) Box committed fraud against Flynn; 13) $505.00, if paid now in cash, would fairly and reasonably compensate Flynn for his damages that resulted from the conduct of Box; 14) $5,000, if paid now in cash, should be assessed against Box and awarded to Flynn as exemplary damages for fraud by Box; and 15) attorney's fees were found to be due to Flynn for the necessary services of his attorney, as follows:

(a) $7,000 for preparation and trial of this case;

(b) $2,500 for appeal to the Court of Appeals;

(c) $1,000 for making or responding to an application for writ of error to the Supreme Court of Texas; and,

(d) $2,500 if application for writ of error is granted by the Supreme Court of Texas.

Final judgment was signed on January 13, 1993. It provided that Flynn recover from Box the sum of $27.63 in actual damages, $5,000 in punitive damages, $828.73 pre-judgment interest, attorney's fees in the amount of $7,000 for preparation and trial of this case, post-judgment interest on the above liquidated sums ($12,856.36) at the rate of 10% per annum until paid, and attorney's fees as found by the jury in the event of an appeal, application for a writ of error or responding to such an application.

Box's motion for new trial was overruled by operation of law.

■ Box requested that only part of the record be sent to the Court of Appeals. He did, however, comply with Texas Rule of Appellate Procedure 53(d), which states:

If appellant requests or prepares a partial statement of facts, he shall include in his request or proposal a statement of the points to be relied on and shall thereafter be limited to such points. If such statement is filed, there shall be a presumption on appeal that nothing omitted from the record is relevant to any of the points specified or to the disposition of the appeal. Any other party may designate additional portions of the evidence to be included in the statement of facts.

The burden is on the appellant to see that a sufficient record is presented to show error requiring reversal. TEX.R.APP.P. 50(d); *Escontrias v. Apodaca*, 629 S.W.2d 697, 699 (Tex.1982). It is undisputed that a complete statement of facts was not brought up for review. It is also undisputed that Flynn did not designate additional portions of the evidence to be included in the statement of facts. The record in this case reveals that the statement of facts contains only the testimony of the defendant Flynn and that of his son, R.K. Flynn. We consider only the plaintiff Box's Exhibit No. 8, which contains copies of checks issued to Box for services rendered. That exhibit was admitted in evi-

dence by the trial court. There are other exhibits in the record but since there is no showing that they were admitted in evidence by the trial court, we do not consider them.

According to the testimony of the defendant Flynn and his son, R.K. Flynn, the defendant Flynn did not get Box a part in the movie "Far and Away." They testified that Box admitted at trial that he worked for Flynn. Flynn's company was hired to deliver mounted extras for the movie. Prior to leaving San Antonio, Texas, for Montana, for filming of the movie, all riders including Box were advised of the amount they would be paid for working in the movie, and that they would be required to rent a horse, tack and costume from Flynn for $125.00 per day. Riders were instructed that if they did not accept these terms, they would not participate in the trip to Montana. Box went to Montana. Immediately upon arriving, he contracted to rent a horse from someone else for a lesser price. Flynn became aware of this, and again advised Box of the terms of their agreement. The horse, costumes and tack had been transported from Texas for use by the riders in Flynn's business, including a horse and equipment for Box, who followed the terms of the agreement for several weeks. However, after receiving his first check, he returned to Texas, leaving Flynn with a horse and equipment with no rider. Later, Flynn received checks made payable to Box for the last few days Box worked. Flynn cashed these checks, using the monies to offset unpaid amounts owed to him by Box for horse, costume and tack rental. Flynn offered repeatedly to make a final accounting with Box, but Box refused.

 · Box contends in his first point of error that "the trial court erred by granting an instructed verdict for the defendant that he was exempt from the Texas Talent Agency Act." Both parties admit in their briefs that the trial court did grant an instructed verdict that Flynn was exempt from the Texas Talent Agency Act. The record does not contain such an order; however, we do consider such an order because of the admissions made by both parties. The instructed verdict required a finding that there was no evidence on this issue. If more than a scin-

tilla of evidence was present the instructed verdict would not have been proper and the court should have allowed it to go to the jury. *Shelton v. Swift Motors, Inc.*, 674 S.W.2d 337, 340 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.).

The defendant Flynn testified:

Q: Are you licensed as a talent agency in the State of Texas?

A: No, I'm not.

Q: Are you required to be licensed as a talent agency in Texas?

A: No, sir, I did not perform as a talent agency. A talent agency brings people in, takes their picture, gets a resume of what they can do and then send it off to production companies and keeps a fee of the, percentage fee of their wages. And I do not do that.

Q: You take no fees, no commissions from the work your employees obtain?

A: None.

Q: Do you hire these people who work in your own company?

A: Yes.

Q: Is it your understanding that that's the way you operate and you are exempt from registering—

A: Yes, that is correct, I'm exempt.

There was no objection by Box to this testimony. There is no evidence in the record which contradicts the above-quoted testimony.

The Texas Talent Agency Act is set forth in TEX.REV.CIV.STAT.ANN. art. 5221a–9 (Vernon Supp.1993). The Act provides that "'Talent Agency' means a person that engages in the business of obtaining or attempting to obtain employment for artists." As asserted by Flynn, he was not in the business of placing riders in positions of employment. He hired riders to work for him, and his business success depended upon placing his horses and tack in movie projects. The Texas Talent Agency Administrative Rules recognize that such a business is not subject to the Texas Talent Agency Act. The Rules state:

The term "talent agency" does not apply to a person who, *without assessing a fee,*

operates a talent agency in conjunction with the person's own business, or as the authorized representative for a bona fide employer, for the exclusive purposes of employing artists for use in or for that business, or by that employer.

16 TEX.ADMIN.CODE § 78.30(c) (West 1993) (TEX.TALENT AGENCY ADMIN.R.) (emphasis added).

Box argues that the amounts of money received by Flynn for use of his horse and tack represent a "fee" for placement of "talent" within the meaning of the Texas Talent Agency Act. If the amount received does not represent a "fee," then Flynn is exempt from the Act.

"Fee" under the Act, however, does not include amounts received as rental for goods. The Act defines "fee" as including:

(1) any money or other valuable consideration paid or promised to be paid for services rendered by a person operating as a talent agency;

(2) any money received by a talent agency in excess of the amount paid by the agency for transportation, transfer of baggage, or board and lodging for any applicant for employment as an artist; or

(3) the difference between the amount received by a talent agency that furnishes an artist for an entertainment production, exhibition, or performance and the amount paid by the talent agency to the artist.

TEX.REV.CIV.STAT.ANN. art. 5221a–9, § 2(d) (Vernon Supp.1993). The amount received by Flynn does not qualify as a "fee" under (1) above, since Flynn did not hold himself out as a talent agent and was not in fact a talent agency as defined by the Act. Further, Flynn received nothing for "services," but rather received only the fair market rental value for items rented to Box. The amount is not a "fee" under (2) above, since Flynn did not hold himself out as a talent agent and was not in fact a talent agency as defined by the Act and that the amount received by him was not residual after expenses, but rather payment for specified goods (i.e., horses, costumes and tack) provided. Similarly, the amount is not a "fee" under (3) above, since Flynn did not hold himself out as a talent agent and was not in

fact a talent agency as defined by the Act and the amount to be paid by Box to Flynn as rental for horses, costumes and tack was predetermined and agreed to by Box and Flynn, as was shown in the testimony of R.K. Flynn in the trial court. Flynn clearly obtained no fee for Box's participation in the movie "Far and Away." Flynn did not engage "in business of obtaining or attempting to obtain employment for artists" within the meaning of the Texas Talent Agency Act. His compensation was for the fair market value of his horses, tack, and costumes, and he received no fee or profit related to the services of the riders who rode his horses.

The trial court was correct in granting an instructed verdict that Flynn was not subject to the Texas Talent Agency Act. The first point of error is overruled.

■ Box next claims that the trial court erred: by improperly permitting the defendant to testify; by allowing the trial amendment prior to hearing any evidence and by failing to strike the defendant's pleadings; therefore, the trial court was without jurisdiction to hear the defendant's counterclaim (second, third, and fourth points of error).

Box served Flynn on October 20, 1992, with a "Notice of Intention to Take Oral Deposition by Non–Stenographic Means and Subpoena Duces Tecum." The notice, directed to the defendant Flynn stated in relevant part:

PLEASE TAKE NOTICE that the oral deposition of RILEY FLYNN will be taken by the non-stenographic means of tape recording, pursuant to the provisions of Rule 202, Texas Rules of Civil Procedure.

Said deposition is to be taken commencing at 4:00 p.m. on the 20th day of November, 1992 following service hereof before Maria T. Ingram, a Notary Public of the State of Texas or her designee under the supervision of Demetra Koelling, a duly licensed Texas attorney, or any other licensed attorney from the firm of Koelling & Koelling, P.C.

Flynn appeared at the appointed time but refused to be deposed when he was informed

that the deposition would be a shorthand transcription made by the secretary of Box.

Flynn objected to the taking of his deposition on the grounds that the items which were requested that he bring to the place when the deposition was to be taken were unduly burdensome, too vague and overbroad, did not state with particularity what it was that was sought, and sought information which was not likely to lead to evidence admissible in the trial of this case. The objections were served on counsel for Box on November 20, 1992, and filed with the County Clerk of Bexar County, Texas, on November 19, 1992.

On December 1, 1992, when the trial began counsel for Box stated to the trial court:

Your Honor, I object to the testimony of Riley Flynn based on his failure to appear at a notice for non-stenographic deposition when I appeared with my full-time secretary, who is a Notary Public. I ask this Court to move to strike the pleadings of the Defendant for discovery abuse and I renew that objection.

Counsel for Flynn replied:

This is for the record, Your Honor, we appeared yesterday and pursuant to a Motion to Strike the testimony of Riley Flynn, the Court heard evidence in the case, the Court reviewed the law applicable to the case. In particular, the Court reviewed Rule 202 Section 1–E of the Texas Rules of Civil Procedure that clearly indicate that the taking of a non-stenographic deposition does not dispense with the requirement for a stenographer to record the deposition. In the absence of a prior motion and order of the Court filed which would allow for the dispensing of a stenographic deposition and allowing the Court an opportunity to fashion such parameters and specifications to ensure the reliability and the trustworthiness of the evidence to be recorded solely by non-stenographic means, the Court after considering all that denied the Motion to Strike.

The trial court, after counsel for Box stated "well, I have renewed the motion, so if the court could." The trial court denied the motion. Then, counsel for Box moved,

Further, Your Honor, I now move separate from that Motion to Strike the Proceedings, that the Court not allow the Defendant, Riley Flynn, to testify in this matter, based on his failure to allow the deposition to proceed when it was properly noticed, and we arrived with a full-time employee who is a Notary Public. So I'm asking you, I'm not asking you to strike the pleadings, I'm asking you not to allow him to testify.

The trial court denied the motion.

Box then filed a motion to compel and for sanctions on November 19, 1992, and sent a copy of the sanction by facsimile transmission to counsel for Flynn on the same day. He alleged in the motion that he served his request for admissions, interrogatories and request for production of defendant Riley Flynn on October 20, 1992, and acknowledged that he received Flynn's "response and objections to his discover request regarding net worth, assets and income along with other objections." Box asked "for all relief prescribed by Rule 215 of the Texas rules of civil Procedure," and for attorney's fees in the amount of $500.

Apparently, the issues raised in Box's Notice of Intention to Flynn's Oral Deposition by Non–Stenographer's Means and his Motion to Compel and for Sanctions, along with Riley's objections thereto, were presented to the trial court at the hearing on November 30, 1992, the day before trial on the merits began. However, the record before this Court does not contain a statement of facts as to what was done, or represented to the court, or what took place at the hearing. All the record reveals is that there was such a hearing.

■ TEX.R.APP.P. 53(a) requires that the appellant, in perfecting his appeal, make a written request to the official reporter of the trial court designating the evidence and other proceedings to be included in the appeal. When appellant requests a partial statement of facts, he must specify in the request the points to be relied upon. As a result, appellant is thereafter limited to such points. While the rules provide that "if such statement is filed, there shall be a presumption on

appeal that nothing omitted from the record is relevant to any of the points specified or to the disposition of the appeal," the Texas Supreme Court has ruled that in the absence of a complete statement of facts, the appeals court will presume that the evidence supports the judgment. *Englander Co. v. Kennedy*, 428 S.W.2d 806 (Tex.1968). Further, an appellate court cannot consider whether an appellant has been prejudiced by an error committed in the course of the trial unless the record relating to the alleged error is before the Court. *Dennis v. Hulse*, 362 S.W.2d 308, 310 (Tex.1962); *Citizens Law Inst. v. State*, 559 S.W.2d 381, 383 (Tex.Civ. App.—Dallas 1977, no writ); *Gordon v. Aetna Cas. & Sur. Co.*, 351 S.W.2d 602, 604 (Tex.Civ.App.—Eastland 1961, writ ref'd). Therefore, since we do not have the record before us of what transpired at the hearing on November 30, 1992, we must presume that the evidence as presented to the trial court supports the denial of the motion presented by Box. Without a statement of fact covering the hearing, it cannot be said that the denials of Box's motion probably caused the rendition of an improper judgment.

The transcript reveals that Box filed with the County clerk and notified Flynn on October 20, 1992, of "Plaintiff's Requests for Admissions, Request for Production and Interrogatories." These were answered by Flynn on November 19, 1992. No objections to the answers and response by Box appears in the transcript. The transcript further shows that Flynn filed with the County clerk and delivered a copy to counsel for Box on November 30, 1992, his Supplemental Answers to Box's Request for Admissions, Request for Production and Interrogatories. However, the transcript does not contain the actual Supplemental Answers.

■ Box also claims that the trial court committed reversible error by allowing Flynn to amend his pleadings. Flynn's First Amended Answer and Counterclaim state that the damages sought were "in excess of the jurisdictional limits of the Court." It was filed on November 20, 1992. Subsequently, Flynn filed his Second Amended Answer and Counterclaim on December 2, 1992. This amendment pled for damages "within the jurisdictional limits of the Court."

Texas Rule of Civil Procedure 63 provides that all pleadings except trial amendments under Rule 66, must be on file seven days before trial if: 1) the pleadings do not operate as a surprise, and 2) leave of court to file is obtained. In the instant case, leave to file the trial amendment by filing the Second Amended Answer and Counterclaims was granted by the trial court on December 2, 1992. The court specifically stated in such order:

> There being no showing that such amendment will operate as a surprise to the opposing party, it is hereby ORDERED that Defendant/Counter-Plaintiff be granted leave to file such trial amendment.

Thus, the trial court properly allowed the proposed trial amendment to be filed under either Rule 63 or under Rule 66. The jurisdictional limits were merely misstated in the first Amended Answer and Counterclaim, with no surprise or prejudice to Box. The trial court properly allowed the filing of the Second Amended Answer and Counterclaims as a trial amendment, and, therefore, had jurisdiction to hear and decide the counterclaim of Flynn. The second, third and fourth points of error are overruled.

■ Box contends in his fifth point of error that the trial court erred in rendering judgment against him because there was no breach of contract between him and Flynn. This is a "no evidence" point. He attacks the judgment in his sixth point of error on the ground that the "finding of a breach of contract is factually insufficient as being against the great weight and preponderance of the evidence." He claims in his seventh point of error that the trial court erred in rendering judgment against him because there was no evidence of fraud, and in his eighth point of error, he asserts that the finding of fraud is factually insufficient as being against the great weight and preponderance of the evidence.

■ Where both "no evidence" and "factually insufficient evidence" points are raised, the appellate court should rule on the "no

evidence" points first. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981).

■ In reviewing "no evidence" points, an appellate court considers only the evidence and reasonable inferences therefrom, which, when viewed in the most favorable light, support the findings of the fact finder, in this case the trial judge, and disregards all evidence and inferences which are contrary to the findings. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987); *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 207 (Tex.1985).

■ In reviewing "factual insufficient evidence" points, a court of appeals reviews all of the evidence and should set aside the finding by the trier of fact only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

The jury in this case found that Flynn and Box agreed Box would receive $200.00 per day for each day he worked on the movie set, and that Box would pay to Riley Flynn from that $200.00, $90.00 as rental for horse, tack and necessary costume articles. It was further found by the jury that Box failed "to comply with the agreements."

R.K. Flynn, a son of the Defendant Flynn, testified in response to the following questions asked of him:

Q: And what were the terms of the agreement?

A: The production company was going to pay to the re-enactor group or groups coming up there the sum of $200 per day for man and a horse, a rider. That was broken down into a certain percentage for the horse, a certain percentage for the costume rental, a certain percentage for the tack and certain percentage for the rider itself. And I explained how much of that $200 was going to go to the individuals who were going with us.

* * * * * *

Q: Do you recall if Mr. Box was present at that meeting?

A: Yes, sir, he was.

Q: You're sure of that?

A: Absolutely.

Q: Can you tell us in as precise detail as you can, how did you explain to the members of the group the terms of the agreement were going to work?

A: I had the breakdown on paper, explained the $200, that there would be a $60 rental fee for the rental of the horses if they didn't have their own horse. If they didn't have their own tack there would be a $15 fee. If they didn't have their own costuming there would be a $15 fee, and that the balance would go to them.

The defendant Flynn testified in answer to the following questions asked of him:

Q: Tell me what the offer was that your company was making to the participants of the group?

A: As has been testified, the offer was that the horse rental was $60 a day and the costume rental was $15 a day, and the tack, saddle, bridle, saddle pad, all of that was $15 a day. And the reason for that is—

Q: That's okay, I'm really trying to speed this up.

A: Okay.

* * * * * *

Q: When was the first time you discovered that Mr. Box wasn't going to honor the terms of his agreement?

A: The first day they were scheduled to work, and I believe that was the Saturday, the 22nd of June.

Q: And how did you discover that?

A: When I saw him saddling another horse—

Q: What did you do?

A: —other than the one he was assigned.

Q: This is repetitious, but you haven't told us. What happened?

A: I walked up to him and asked him what he was doing. He said he was going to rent a horse from Bobby Brooks. And I said, no, you agreed to come up with the group and you have to rent the horse you agreed to rent. You can't come up here individually and go off and make other arrangements or agreements, nor could

any other member of any other group that came up there. They were with their group and responsible to their group leader and whatever arrangements were made. And believe me, there were all kinds of arrangements made.

Q: What was his response to this?

A: He was upset. But I told him that that was—he had no option, that he had agreed to that and he must perform, otherwise I would have to send him back to San Antonio. . . .

Q: Did he then agree to use your horse?

A: Yes, he used the horse.

Q: He testified—

A: For the—

Q: He testified that he worked five and a half days.

A: That's correct.

Q: Mr. Box testified he received a couple of checks totaling a gross of $700.

A: That's correct. He also—

\* \* \* \* \* \*

Q: For the 5.5 days and $90 a day rental, you were entitled to receive $495?

A: That's correct.

Box argues that the terms set out by R.K. Flynn clearly sets out an option, and that the defendant Flynn's testimony is not evidence of breach but is evidence that Box was attempting to exercise one of the options in the agreement and that he would not be permitted to do so. He further argues that there is no evidence that there was a contract which required Brian to rent a horse from Flynn. We do not agree.

As stated above, Box has presented an incomplete record. The testimony heard by the jury and the trial court was replete with testimony from both R.K. Flynn and the defendant Flynn that a contract was formed. The testimony presented showed to the jury's satisfaction that there was no "option" in this contract allowing Box, once he was transported to Montana by Flynn for the purpose of riding Flynn's horse, wearing Flynn's costumes, and using Flynn's tack, to change his mind and find another horse. The jury in the case found that the evidence presented supported a finding of breach of contract. Further, the judge in the trial court failed to find a lack of evidence of breach of contract, since the trial court denied Box's Motion for New Trial, which Motion alleged such factual insufficiency. The findings of the jury and the trial court with regard to the breach of contract charge was consistent with the evidence developed at trial and not against the great weight and preponderance of the evidence. The fifth and sixth points of error are overruled.

■ In order to constitute actionable fraud it must be shown by the pleadings and the evidence: 1) that a material representation was made; 2) that it was false; 3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as positive assertion; 4) that he made it with the intention that it should be acted upon by the party; 5) that the party acted in reliance upon it, and 6) that he thereby suffered injury. Each of these elements must be established with a reasonable degree of certainty and the absence of any one of them will prevent a recovery. *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977); *Mann v. Fitzhugh–Straus Medina Ranch*, 640 S.W.2d 367, 371 (Tex.App.—San Antonio 1982, no writ). Flynn alleged in Section IX of his Second Amended Answer and Counterclaim:

BOX's conduct constitutes fraud as defined by the laws in the State of Texas. Further, BOX committed fraud against FLYNN by concealing or failing to disclose the material fact within his knowledge, such being that he had no intention of complying with the terms of the contract described above, that BOX knew FLYNN had no way of discovering BOX's intent to refuse to comply with such contract, that BOX intended to induce FLYNN to take him to Montana as a result of such failure to advise FLYNN of his true intent to not comply with the contract described above, and that FLYNN sustained injury as a result of BOX's conduct. . . .

■ The above allegations are sufficient to allege fraud by Box. Concerning proof of fraud, we again note that Box has presented an incomplete record, and under

the rule announced in *Englander Co. v. Kennedy*, 428 S.W.2d 806 (Tex.1968), we must presume that the evidence presented to the jury and the trial court supports the finding by the jury that Box committed fraud against Flynn and the judgment of the trial court in favor of Flynn. Moreover, an examination of the testimony of Flynn demonstrates that Box agreed to the details of the agreement with Flynn; that Box traveled to Montana with no intention of performing under this agreement; that Box traveled to Montana knowing that Flynn was relying on Box's assurance that he (Box) would perform under the agreement; that Box failed to perform under the agreement; and that Flynn was damaged as a result of Box's conduct. This testimony was sufficient to show that Box committed fraud. The jury found that the elements of fraud existed. There was sufficient evidence to support the finding, which was not against the great weight and preponderance of the evidence. The seventh and eighth points of error are overruled.

In the ninth point of error, Box claims that the trial court erred in rendering judgment against him "as the actual damages were *de minimis non curat lex*"; and in the tenth and final point of error, it is contended that the $5,000 punitive damages award bears "no reasonable relationship to the actual damage occurred." We do not agree.

■ The jury finding of actual damages in favor of Flynn comprised a finding that Box owed Flynn $595.00, offset by $567.37 that Flynn owed Box. The jury additionally found Box liable for $5,000.00 in punitive damages. Box complains on appeal that the amount of exemplary damages were *de minimis non curat lex*. In effect, Box argues that the actual damage award of $27.63 should not support the award of $5,000.00 in exemplary damages.

Box, and no court found by this Court, has applied the equitable doctrine to *net amounts* awarded to plaintiff and defendant. *Cf. HSAM, Inc. v. Gatter*, 814 S.W.2d 887 (Tex.App.—San Antonio 1991, writ dism'd by agreement); which involved not $17.95 as claimed by appellant, but $.02, representing the time value of $17.95 for a stated period. *HSAM*, 814 S.W.2d at 892. In addition, the

*HSAM* court found the doctrine applicable primarily because the amount in dispute ($17.95) was disputed by plaintiff for the purpose of creating a cause of action. In *Anguiano v. Jim Walter Homes, Inc.*, 561 S.W.2d 249, 255 (Tex.Civ.App.—San Antonio 1978, writ ref'd n.r.e.), the appellee relied on the doctrine of *de minimis non curat lex* for the failure of the contract to be designated as "retail installment contract" as designation by the Texas Consumer Credit Code; the case did not involve a dollar amount, but rather a damage award based on an incorrect designation of the contract; it was held that the doctrine did not apply.

■ "This doctrine of [*de minimis non curat lex* ] stands for the proposition that the law does not care for or take notice of very small or trifling matters." *Anguiano*, 561 S.W.2d at 255. The doctrine does not apply to the instant case. The amount granted Flynn was offset by the amount claimed by Box when he filed suit against Flynn.

■ The amount to be awarded as exemplary damages generally rests in the discretion of the jury. *Texas Farmers Ins. Co. v. Soriano*, 844 S.W.2d 808 (Tex.App.—San Antonio 1992, writ granted). In determining the sufficiency of evidence to sustain an award of damages, an appellate court should accept the jury's resolution of any conflicts or inconsistencies in the evidence. *Id.* In reviewing whether a damage award is excessive, an appellate court must review the evidence and facts of the case in the light most favorable to the damage award. *Id.*

■ Even though an appellate court must review awards of exemplary damages for reasonableness, findings of the jury will generally not be disturbed on appeal if the probative evidence supports the award. The purpose of awarding exemplary damages is not to compensate the plaintiff, but to punish and set an example for others. *Elbar, Inc. v. Claussen*, 774 S.W.2d 45, 53 (Tex.App.—Dallas 1989, writ dism'd); *Pedernales Electric Coop., Inc. v. Schulz*, 583 S.W.2d 882, 884–85 (Tex.Civ.App.—Waco 1979, writ ref'd n.r.e.). This approach is consistent with the approach of the United States Supreme Court, which has ruled that an award of punitive

damages is entitled to a strong presumption of validity. *TXO Prod. Corp. v. Alliance Resources Corp.*, —— U.S. ——, ——, 113 S.Ct. 2711, 2721, 125 L.Ed.2d 366 (1993), which upheld an award of $10,000,000 exemplary damages, an award that was 526 times the award of actual damages of $19,000. The award of exemplary damages in the instant case is 185 times the award of actual damages.

Five factors are considered in judging whether exemplary damages are reasonably related to actual damages, including: 1) nature of the wrong; 2) character of the offensive conduct; 3) degree of culpability; 4) situation and sensibilities of the parties; and 5) extent to which the conduct offends the public's sense of justice and propriety. *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981). All of those factors were proven in the case at bar. The ninth and tenth points of error are overruled.

The judgment of the trial court is affirmed.