Charles FOUST and McDaniel Farms, Inc., Appellants/Appellees,

v.

ESTATE OF Roland WALTERS, Deceased, by and through its Co–Independent Executors, Corey Walters and Rolinda Walters, d/b/a Walters Farms and Russell L. Lindeman d/b/a Rusty's Flying Service, Appellees/Appellants.

No. 04–98–00639–CV.

Court of Appeals of Texas, San Antonio.

April 12, 2000.

See also 975 S.W.2d 329.

Randall P. Crane, Aldolfo E. Cordova, Jr., Crane & Cordova, San Benito, for appellants.

Lavern D. Harris, Harris & Harris, P.C., Kerrville, Ron A. Sprague, R. Matt Lair, Gendry & Sprague, P.C., San Antonio, for appellees.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, KAREN ANGELINI, Justice.

ON MOTION FOR REHEARING OF
RUSSELL L. LINDEMAN D/B/A
RUSTY'S FLYING SERVICE

Opinion by: ALMA L. LÓPEZ, Justice.

This court's opinion and judgment dated February 2, 2000 are withdrawn, and this opinion and judgment are substituted. Russell L. Lindeman's motion for rehearing is denied. We substitute this opinion in response to modify language characterizing Lindeman's argument about to limitations. Our original opinion remains the same in all other respects.

This is a negligent application of herbicide case raising issues of misnomer, limitations, settlement credit, prejudgment interest tolling during settlement negotiations, expert testimony, lost income, preemption, independent contractors, and the gate-keeping responsibilities of the trial court. For the reasons stated in this opinion, we affirm in part and reverse and render in part the judgment of the trial court.

### FACTUAL BACKGROUND

Four McDaniel family members who farmed together in the Valley moved part of their farming operation to Brackettville in 1985. Traditionally, they farmed various tracts under various informal partnership arrangements. They also formed a corporation, McDaniel Farms, Inc., to purchase a tract near Brackettville. The proceeds and expenses from their farming operations in this area flowed through the corporate bank account. Otherwise, the corporation served as the "d/b/a" for the McDaniel shareholders who operated informally in all contractual matters. The officers and shareholders did not hold annual meetings or keep up a corporate minute book.

In 1994, they planted cotton in this area and formed another informal partnership, with landowner Foust, to lease his land and plant cotton. Some of these cotton crops were allegedly damaged due to her-

bicide drift when a neighboring farmer named Roland Walters purchased Weedar 64 (containing the active ingredient 2,4D) and hired Russell Lindeman, d/b/a Rusty's Flying Service, to apply the chemical spray to his milo fields. A Lindeman representative inspected the crop and advised the McDaniels and Foust to grow out the crop and report the results for purposes of determining their losses, which they did.

The five individual farmers sued Lindeman, the Walters Estate, and Helena Chemical Corporation for lost income resulting from the damage caused to their crops. Helena Chemical was non-suited. The defendants filed special exceptions to the McDaniel parties, complaining they were vaguely described and lacked standing to sue. The trial court sustained the special exceptions, and plaintiffs filed a Third Amended Original Pleading which substituted McDaniel Farms, Inc. for the four McDaniel individual plaintiffs. After a five-day jury trial, the jury found Walters 30% negligent and Lindeman 70% negligent, and returned a verdict in favor of plaintiffs, awarding damages to Foust and McDaniel Farms in the amounts of $81,488.00 and $162,976.00 respectively.

The court took into consideration various post-verdict motions, ruled that the McDaniel Farms claims were barred by the two-year statute of limitations, and reduced Foust's award by $14,000.00, representing the value of a settlement credit from Helena Chemical, for judgment of $67,488.00. The court also found that open settlement offers tolled the running of prejudgment interest from December 11, 1996 to November 3, 1997. All sides appealed.

## I.

Appellants Foust and McDaniel Farms raise five issues concerning limitations, settlement credits, prejudgment interest in the judgment notwithstanding the verdict, and that Foust should be allowed to recover damages on behalf of all plaintiffs.

### LIMITATIONS

Appellants Foust and McDaniel assert that the trial court erred in ruling that the McDaniel Farms claims were barred by the two-year statute of limitations.[1] They argue that their Third Amended Original Petition was filed as a result of the trial court's ruling striking the

1. Significant dates relative to the limitations issue:

| | |
|---|---|
| • May 14, 1994 | Cotton crops damaged by herbicide drift |
| • June 2, 1995 | Plaintiffs' Original Petition filed by Foust, four McDaniels, individually, and the farming partnership of the five individuals |
| • June 20, 1996 | Lindeman filed special exceptions to Second Amended Petition concerning individual McDaniels' standing |
| • August 30, 1996 | Lindeman's brief on special exceptions filed |
| • September 3, 1996 | Hearing on Lindeman's special exceptions |
| • September 13, 1996 | Walter's special exceptions to Second Amended Petition filed concerning standing |
| • September 30, 1996 | Plaintiffs' Third Amended Original Petition filed, replacing individual McDaniels with McDaniel Farms, Inc. (on deadline to add new parties) |
| • October 15, 1996 | Court signs order concerning Sept. 3, 1996 hearing, sustaining Lindeman's special exceptions to Second Amended Original Petition, finding that individual McDaniels lack standing to sue for McDaniel Farms, striking all McDaniels' claims in the Second Amended Petition. |
| • October 17, 1996 | Lindeman files motion for partial summary judgment that McDaniel Farms' claims are barred by 2-year Statute of Limitations |
| • October 21, 1996 | Walters files motion for partial summary judgment on same grounds |
| • March 4, 1997 | Order denying summary judgment motions |
| • October 1997 | Jury Trial |
| • April 28, 1998 | Judgment NOV |

McDaniel claims for lack of standing. Appellees characterize the third amended pleading as "a voluntary non-suit" of the individual McDaniels which rendered moot the order sustaining the special exceptions which issued fifteen days later. The trial court, however, sustained the special exception in open court.

Appellees also argue that appellants waived this issue because they were required to respond to their affirmative defense, but failed to plead avoidance of limitations, prove, and obtain a jury finding in support of this pleading. *See Wise v. Anderson,* 163 Tex. 608, 359 S.W.2d 876, 880 (1962); *Wright v. Gifford–Hill & Co., Inc.,* 736 S.W.2d 828, 834 (Tex.App.-Waco 1987, writ ref'd n.r.e.). Under the circumstances presented here, we find no waiver.

Appellees also argue that because appellants named a new party, McDaniel Farms, Inc., the relation-back doctrine does not apply. *See Koch Oil Co. v. Wilber,* 895 S.W.2d 854, 863 (Tex.App.-Beaumont 1995, writ denied); *Leeds v. Cooley,* 702 S.W.2d 213 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.). The Code provides:

> If a filed pleading relates to a cause of action, cross action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.

TEX. CIV. PRAC. & REM.CODE § 16.068 (Vernon 1997). Neither of the cases cited by Lindeman lend support to his thesis here, however. The *Wilber* case was a class action where plaintiffs attempted to add additional mineral interest owners after limitations had run. These were simply additional, new parties. In *Leeds,* plaintiffs sought to add additional defendants who had done nothing to create a situation whereby the discovery rule might be invoked.

The application of Section 16.068 to a situation where the plaintiff was misnamed has never been that harsh. Misnomer cases are analyzed by asking the following questions: (1) Would a judgment under the original pleading bar recovery under the amended pleading? (2) Would the same evidence support both of the pleadings? (3) Is the measure of damages the same in both pleadings? (4) Are the allegations of each pleading subject to the same defenses? *See Phoenix Lumber Co. v. Houston Water Co.,* 94 Tex. 456, 61 S.W. 707, 709 (1901). When a party is misnamed, but no one has been misled or disadvantaged by the error in pleading, the relation-back doctrine operates to preserve the claim against a bar of limitations. *See Dougherty v. Gifford,* 826 S.W.2d 668, 677 (Tex.App.-Texarkana 1992, no writ); *Palmer v. Enserch Corp.,* 728 S.W.2d 431, 434 (Tex.App.-Austin 1987, writ ref'd n.r.e.). If the nature of the suit against the defendants remains unchanged, the substitution of parties-plaintiff does not constitute a new suit. *See Vaughn Bldg. Corp. v. Austin Co.,* 620 S.W.2d 678, 682 (Tex.Civ.App.-Dallas, 1981), *aff'd,* 643 S.W.2d 113 (1982); *Medford v. Red River County,* 84 S.W.2d 345, 352 (Tex.Civ.App.-El Paso 1935, no writ).

We find that this is a simple misnomer case where the change in plaintiffs in response to a court order to replead to special exceptions created no surprise or prejudice to the defendants. The statute of limitations had run four months earlier, however, the substitution of the corporate entity for the four individuals who were the sole owners of the corporation presented no surprise or unfair prejudice to the defendants. The amended cause of action was wholly based and grew out of the same set of facts and occurrences as were alleged in the two previous petitions. Accordingly, the amended petition related back to the original, timely-filed petition. Foust and McDaniel Farms' first issue is

sustained. This holding renders Foust and McDaniel Farms' fourth and fifth issues moot.

## SETTLEMENT CREDIT

Prior to jury deliberations, Lindeman filed an election of settlement credit which stated that an indebtedness for chemical purchases by the plaintiffs had been forgiven by Helena Chemical in exchange for the plaintiffs' non-suit. The attorney estimated the value of this debt forgiveness to be "approximately $14,000.00." Bobby R.(Rusty) McDaniel testified at his deposition that plaintiffs' nonsuit of Helena Chemical was not the result of any "promise to pay anything of monetary value in return for their dismissal." However, appellants' counsel did disclose the fact that the attorneys for these parties had discussions concerning a debt for agricultural chemical supplies the McDaniels owed Helena Chemical in an approximate amount of $14,000.00 and McDaniels claims against Helena Chemical as supplier of the chemicals sold to Walters. The parties involved understood from these discussions that should Helena Chemical file suit to collect the McDaniels' debt, McDaniels would countersue. Sometime later, Foust and McDaniels voluntarily non-suited Helena Chemical.

Appellants Foust and McDaniel Farms argue that there is insufficient evidence to establish these alleged facts. They claim the record does not show any connection between the purported debt and Foust, who suffered the reduction in damages. Appellants contested the very existence of a settlement, asserting the deposition testimony only showed that plaintiffs continued to be indebted to Helena Chemical, that Helena Chemical had not pursued collec-

tion of the debt, and that should Helena do so, plaintiffs would countersue. In support of this position, appellants cite to *Mobil Oil Corp. v. Ellender*, 934 S.W.2d 439 (Tex. App.-Beaumont 1996), where the intermediate appellate court held that "lawyer talk" was not sufficient proof for purposes of supporting a settlement credit. The supreme court reversed this holding, however, and stated that a dollar-for-dollar election which states the settlement amount is sufficient where the opposing party does not offer controverting evidence. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex.1998).

■■■ The settlement credit provision of the code begins with *"If* the claimant has settled with one or more persons." TEX. CIV. PRAC. & REMEDIES CODE § 33.014 (Vernon 1997)(emphasis added). The party seeking the credit has the burden of proving the settlement amount. *See Ellender; First Title Co. of Waco v. Garrett*, 860 S.W.2d 74, 78 (Tex.1993). Implied in this burden is the non-settling party's obligation to prove that a settlement has occurred. The deposition testimony establishes no more than two opposing parties threatening to take legal action to the point where they reach an impasse. There is no evidence of a formal or informal agreement, no evidence that releases from liability were given. The stipulated amount of $14,000.00 is no more than an acknowledgment that McDaniels Farms owed a debt unrelated to this cause of action and has refused to pay it. Helena has unilaterally decided not to pursue the debt.[2] Under these circumstances, we hold there was insufficient evidence of a settlement agreement to entitle Lindeman and Walters to an election of credit.

---

**2.** The non-settling tortfeasor may only claim a credit based on the damages common to the settling and non-settling defendants. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex.2000); *Paschall v. Peevey*, 813 S.W.2d 710, 712 (Tex.App.-Austin 1991, writ denied); *Hill v. Budget Fin. & Thrift Co.*, 383 S.W.2d 79, 81 (Tex.Civ.App.1964, no writ). Helena Chemical, was at one time an alleged joint

tortfeasor for supplying the herbicide which damaged Foust and McDaniels crops. The jury's finding of negligence, however, focused only on the method of application of the herbicide. The dispute over debt collection with McDaniel Farms arises from a purchase of herbicide unrelated to the events for which Helena Chemical was once named a defendant in this case.

Foust and McDaniel Farms' second issue is sustained.

### TOLLING PREJUDGMENT INTEREST

The provision, effective at trial, requiring a tolling of prejudgment interest while a settlement offer is on the table stated:

> If judgment for a claimant is less than the amount of a settlement offer by the defendant, prejudgment interest does not accrue *on the amount of the judgment* for the period during which the offer may be accepted.
>
> If judgment for a claimant is more than the amount of the settlement offer by the defendant, prejudgment interest does not include prejudgment interest *on the amount of the settlement offer* for the period during which the offer may be accepted.

TEX. CIV. STAT. ANN. Art. 5069–1.05, § 6(b), (c) (current version at TEX. FIN.CODE § 304.105(a), (b) (Vernon 1999)). The statute further requires that a settlement offer be communicated in writing to the opposing party, its attorney, or representative in order to trigger this tolling provision. *See id.* at § 6(e)(current version at TEX. FIN. CODE § 304.106).

Appellants claim that any settlement offers relevant to this issue were always made to the plaintiffs jointly, never to separate parties. Thus there was never any allocation of settlement offers that can be compared against damage awards to determine whether the tolling provision of what is now known as the Texas Finance Code was triggered—except one. Appellees made a $42,000.00 settlement offer to Foust alone which remained open from July 29, 1996 to September 2, 1996. As that amount is only half of what the jury awarded, Foust argues that it was error for the trial court to reduce prejudgment

interest. Lindeman and Walters respond that they met their burden of "putting the request before the court" and providing the court with competent evidence to establish the proper amount of the modified interest award. Lindeman's counsel filed a sworn affidavit which outlined the history of settlement offers, including the relevant dates and amounts. The affidavit concludes with this statement:

> As a result of these settlement offers, an offer to settle in excess of $75,000 was available to Plaintiffs at all times between March 6, 1995 and November 2, 1997, [except for the periods then listed]. The total number of days that pre-judgment interest will apply to a Judgment of less than $75,000 will be 186 days.

All parties cite to *Quality Beverage, Inc. v. Medina* to support their positions. There, the First Court of Appeals construed § 6(c) to require the party seeking application of this tolling provision to bring a request to the court's attention while the court had plenary jurisdiction. Both sides have an obligation to provide the court with competent evidence to establish the proper amount of the interest award. *See Quality Beverage, Inc. v. Medina,* 858 S.W.2d 8, 11 (Tex.App.-Houston [1st Dist.] 1993, no writ). The opinion goes on to imply that competent evidence in this context could be stipulations, affidavits, or live testimony at a post-verdict or timely post-judgment hearing. *See id.* Quality Beverage failed to provide competent evidence when its counsel merely attached a letter as an exhibit to a response on a motion to modify the judgment. *See id.*[3] In this case, appellees offered a sworn affidavit which appellants did not controvert. Given our ruling that the damage award to McDaniel Farms shall be

---

**3.** The panel opinion then bent over backwards to find a way to let the attorney fix his mistake, taking into account his uncontroverted argument in his brief and at oral argument to find no waiver. *See id.;* TEX.R.APP. P. 74(f)(statement in appellant's brief accepted as correct unless challenged by opposing par-

ty). The court reversed and remanded the matter for further proceedings. *Id.* Justice Mirabel published a dissent following a vote to overrule rehearing *en banc* which would have found waiver because the evidence was clearly incompetent in this scenario. *See id.* at 12.(Mirabel, J., dissenting).

restored, we find no error in the trial court's tolling of prejudgment interest. Appellants' third issue is overruled.

## II.

Appellee Lindeman raises five cross-points concerning the failure to disclose and reliability of an expert opinion, legal sufficiency *sans* the expert opinion, legal and factual sufficiency of crop damage data, and the sufficiency of damages evidence, *i.e.*, lost gross vs. net income.

### EXPERT TESTIMONY

■■■ Foust and McDaniel Farms designated Randy Colvin as an expert in aerial application of herbicide. He filed a brief report, was deposed, and, over Lindeman's objection, testified at trial. In his first issue, Lindeman complains that as there were material changes in Colvin's testimony at trial that were not disclosed at his pre-trial deposition or in a supplemental report, it was error to permit Colvin to testify. However, Lindeman has not brought forward a complete record for review of this issue. The transcript of Colvin's deposition is not in the record, and Lindeman cites only to his motion to strike the expert which, like his brief, merely contains selective quotes from the deposition.[4] The transcript of the deposition was not attached to the motion to strike. We cannot consider whether a party has been prejudiced by error committed in the course of the trial unless the record relating to the alleged error is before us. *Box v. Flynn*, 870 S.W.2d 585, 592 (Tex.App.-San Antonio 1993, no writ). In the absence of this deposition transcript, we must indulge every presumption in favor of the trial court's decision to overrule Lindeman's motion to strike, for the burden is on the party seeking review to see that a sufficient record is presented to show error. *See The Home Ins. Co. v.*

*Hambric*, 906 S.W.2d 956, 961 (Tex.App.-Waco 1995, no writ)(cannot create a new trial court record by supplementation).

■■■ Our rules of procedure favor full disclosure of the evidence. *See* TEX.R. CIV. P. 166(b). They do not, however, "prevent experts from refining calculations and perfecting reports through the time of trial." *See Exxon Corp. v. West Texas Gathering Co.*, 868 S.W.2d 299, 304 (Tex. 1993). Lindeman describes as material a change from stating in deposition what *his* standard of care is to stating at trial what *a reasonably prudent aerial applicator* would do. The substance of the standard of care and the conduct at issue, however, remained the same. This is merely a skirmish in semantics.

■■ In his second issue, Lindeman contends that the trial court erred in permitting Colvin to testify because his testimony was unreliable and irrelevant. "The reliability and relevance prerequisites for expert opinion to be admissible are part of Rule 702 and apply to all such evidence." *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex.1998). The *Gammill* case advises that

> [t]he trial court's gatekeeping function under Rule 702 does not supplant cross-examination as "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert [v. Merrell Dow Pharmaceuticals, Inc.]*, 509 U.S. [579] at 596, 113 S.Ct. 2786, 125 L.Ed.2d 469. But neither does the availability of cross-examination relieve the trial court of its threshold responsibility under Rule 702 "of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597, 113 S.Ct. 2786.

*Gammill*, 972 S.W.2d at 728.

■■ Colvin testified that he was a high school graduate with two years of

---

4. Plaintiff-appellees object to consideration of this point because the deposition testimony is not included in the record on appeal. They attach to their response brief the entire deposition transcript of Colvin and his expert report, only to have available should this court not find waiver. And to continue in this trend, Lindeman objects to his opponents' appendix because these items are not part of the appellate record.

college credit. He grew up in the aerial application business and was familiar with all aspects of the business. He has held a commercial pilot's license since 1974 and has been licensed by the Texas Department of Agriculture as a commercial applicator since 1976. In 1988, the Texas Aerial Applicators, a statewide trade association, named him operator of the year. The examples of testimony listed in Lindeman's brief (p. 10–13) basically show that Colvin was subjected to intense cross-examination by Lindeman's counsel. It would seem that the jury easily could judge the value of Colvin's testimony under these circumstances.

■■■ Should the court find Colvin's testimony unreliable and irrelevant, Lindeman goes on to argue in his third issue that the trial court's judgment is based on legally insufficient evidence. A negligence claim against an aerial applicator must be established with expert testimony. *See Hager v. Romines*, 913 S.W.2d 733, 735 (Tex.App.-Fort Worth 1995, no writ). In *Hager*, the plaintiffs failed to present their own expert to controvert the defendant-applicator's testimony that he had met the standard of care of an aerial applicator. *See id.* The court stated, "Not only is flying an airplane not within the realm of experience of the ordinary, prudent person or juror, applying herbicide and pesticide aerially requires use of specialized equipment and techniques that are not familiar to the ordinary person." *Id.*

■■■ We find no error in admitting Colvin's testimony. But even so, the jury heard ample evidence of negligent application from other experts. TDA inspector Roger McGee testified that after inspecting the area and TDA records, he concluded that Lindeman had allowed the herbicide to drift onto the cotton fields. Plaintiff's agronomist reinforced this theory in testifying about the damage this herbicide did to the cotton fields in question. He further testified that Lindeman applied Weedar 64 when the temperature was 91 degrees, and that application under these circumstances was the "least safe" condition because high temperatures cause thermals to form which in turn cause chemical particles to drift. TDA standards instruct applicators to "cease spraying when ambient air temperatures exceeds 90" degrees. There was also evidence that wind speed did not indicate that it was safe to apply the herbicide on the day in question. Lindeman, testifying as an aerial application expert, in an admission against interest, stated that although it was not prudent to spray 2,4D within a mile of cotton, he had done so along a fence line within 200 to 300 yards of plaintiffs' fields.

Under the circumstances, we find that the trial court did not abuse its discretion in admitting Colvin's testimony, and that in any event, the jury heard a great deal of additional evidence from other experts by which they could evaluate the evidence. Appellant Lindeman's first three issues are overruled.

### Lost Income

■■■ In Lindeman's fifth issue, he argues that Foust's figures of income lost were "gross" rather than "net" because the data did not include expenses that were saved due to the decrease in production. The measure of damages for lost crops is their market value less all expenses of cultivating and bringing the crops to market. *See International Harvester Co. v. Kesey*, 507 S.W.2d 195, 197 (Tex.1974); *Engelman Irr. Dist. v. Shields Bros., Inc.*, 960 S.W.2d 343, 351 (Tex.App.-Corpus Christi 1997, pet. denied *per curiam* ). In crop loss cases, a jury is entitled to consider: 1) the probable yield of the crop under proper cultivation; 2) the value of the yield when it has matured and is ready for sale; and 3) the expense of maturing, preparing, and placing the crop. *International & G.N.R. Co. v. Pape*, 73 Tex. 501, 11 S.W. 526, 527 (1889); *Engelman Irr. Dist.*, 960 S.W.2d at 351. Generally, the difference between the value of the probable crop in the market and the

expenses associated with the crop will give the value of the growing crop with reasonable certainty. *International & G.N.R. Co.*, 11 S.W. at 527.

■ Lindeman claims the evidence of lost income is insufficient in this case because it does not include costs appellants would have incurred in cultivating, gathering, preparing for and placing the additional, anticipated yield of cotton in the market, including additional gin expenses per bale, had it not been damaged. Plaintiff-appellees presented evidence that these expenses were taken into consideration. They had been told by Lindeman's representative that they should grow the crop out to maturity. In doing so, they incurred the same expenses as they would have put into a normal crop. Thus, they experienced no savings in fertilizer, herbicide application, irrigation, labor, harvesting, or transportation and ginning cost. In fact, the evidence demonstrated that plaintiffs incurred added costs as a result of the damage and the figures presented were "net," not "gross." We find that the jury decided this issue after hearing conflicting evidence and we will not disturb their decision. Lindeman's fifth issue is overruled. Lindeman's sixth issue is rendered moot by virtue of our ruling on the misnomer above.

## III.

Appellee Walters raises five cross-points concerning preemption; legal sufficiency of what he describes as a negligent contracting claim, and legal sufficiency of damages evidence.

### PREEMPTION

■ Walters raises federal preemption in his first issue with regards to jury issues 1–3 because state tort claims based upon inadequate instructions or warnings are preempted by the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136, *et seq.* FIFRA regulates the content and format of labeling for herbicides and other chemical substances. It preempts all common law tort suits against manufacturers of EPA-registered pesticides which are based solely upon claims relating directly or indirectly to labeling. *See id.; Quest Chemical Corp. v. Elam*, 898 S.W.2d 819, 820 (Tex.1995). Walters cites other jurisdictions for the proposition that this preemption extends to suppliers as well as manufacturers. *See All–Pure Chem. Co. v. White*, 127 Wash.2d 1, 896 P.2d 697, 702 (1995) (state tort remedy against distributor and retailer preempted); *Taylor AG Indus. v. Pure–Gro*, 54 F.3d 555, 562–62 (9th Cir.1995)(FIFRA preemption applies to distributors as well as manufacturers).

■ Walters, having purchased the 2,4D from a retail supplier and "supplied" the chemical to the aerial applicator, seeks to stand in the shoes of a supplier. Walters, a neighboring landowner, however, was the consumer, not the supplier in this instance. Moreover, Foust and McDaniel Farms have not complained that the labeling was inadequate on the herbicide; rather, they alleged that the labeling in this instance demonstrates that Walters and Lindeman were negligent in applying the herbicide. Walters' first issue is overruled.

### INDEPENDENT CONTRACTOR DEFENSE

"As the danger that should reasonably be foreseen increases, so the amount of care required also increases." *Ligocky v. Wilcox*, 95 N.M. 275, 620 P.2d 1300, 1302 (1980).

■ When reviewing the legal sufficiency of the evidence, we consider only evidence and inferences tending to support the jury findings, disregarding all evidence and inferences to the contrary. *See Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex. 1992). Challenges to the legal sufficiency of the evidence issues

must be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or

of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence established conclusively the opposite of a vital fact.

*Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997) (citing Robert W. Calbert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 362–63 (1960)), *cert. denied,* 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *see also* W. Wendell Hall, *Standards of Review,* 29 St. Mary's L.J. 351, 477 (1998). Thus, if we find any evidence of probative force to support the jury's findings, the point must be overruled and the findings upheld.

In his second issue, Walters argues that the evidence in support of the jury's answers to Questions 2 (percent of negligence) and 3 (amount of damages) is legally insufficient. Walters asserts that he did not spray or apply the herbicide or direct Lindeman in its application. At most, Walters purchased the herbicide and hired Lindeman as an independent contractor to apply it.

■■■ Lindeman was an independent contractor. *See Pitchfork Land & Cattle Co. v. King,* 162 Tex. 331, 346 S.W.2d 598 (1961); *Frazier v. Moeller,* 665 S.W.2d 155, 156 n. 2 (Tex.App.-Eastland 1983, writ dism'd). It is the well-settled law of this state that one who contracts for work to be done by an independent contractor is not liable for the negligence of the latter. *Cameron Mill & Elevator Co. v. Anderson,* 98 Tex. 156, 81 S.W. 282 (1904); *Loyd v. Herrington,* 143 Tex. 135, 182 S.W.2d 1003, 1004 (1944). But, as stated in *Goolsby v. Kenney,* 545 S.W.2d 591, 593–594 (Tex.Civ.App.-Tyler 1976, writ ref'd n.r.e.),

[t]his rule is subject to an important exception where the work is inherently dangerous, however skillfully done. *Cameron Mill & Elevator Co. v. Anderson, supra.* ... No recovery may be allowed for an injury resulting from an act or fault purely collateral to the work and which arises entirely from the wrongful act of the independent contractor or his employees. *Loyd v. Herrington, supra,* p. 1005; *Brownsville Navigation Dist. v. Valley Ice & Fuel Co.,* 313 S.W.2d 104 (Tex.Civ.App.-San Antonio 1958, no writ). The burden is on the plaintiff to show an exception to the general rule exempting the owner or employer from liability. *Wilson v. Crutcher,* 176 S.W. 625, 628 (Tex.Civ. App.-Texarkana 1915, writ ref'd); *Harris v. Farmers' & Merchants' State Bank,* 239 S.W. 1027, 1029 (Tex.Civ. App.-El Paso 1922, no writ).

■■■ The supreme court has yet to determine whether crop dusting is inherently dangerous. *See Leonard v. Abbott,* 366 S.W.2d 925, 929 (Tex.1963). At the intermediate appellate level, however, an aerial application of herbicide has been found to be an inherently dangerous activity when the spraying under conditions which favor drift is done near susceptible crops. *See Frazier,* 665 S.W.2d at 157 & 158 (noting *Pitchfork* did not address inherent danger issue); *see also Gragg v. Allen,* 481 S.W.2d 452, 453 (Tex.Civ.App.-Waco 1972, writ dism'd)(aerial spraying of chemical defoliants and herbicides has potential to be classed as inherently dangerous). Walters' liability is based partly upon the fact that farmers know or should know that susceptible crops were growing in neighboring fields, and that there were safer products on the market in light of this fact.[5] In this case, the evidence shows that Walters is ultimately responsible for

---

5. The various theories upon which aerial crop sprayers and hiring landowners are liable for damage to neighboring crops are annotated in an article by Jonathan M. Purver, *Liability for Injury Caused by Spraying or Dusting of Crops,* 37 A.L.R.3d 833 (1962). See also,

Chapman, *Crop Dusting–Scope of Liability and a Need for Reform in the Texas Law,* 40 Texas Law Review 527, for a discussion of the standard of care applied to aerial crop spraying.

the decision to apply the herbicide when conditions favored drift. The jury heard testimony from Walters' ranch manager, Neil Simons, that Helena Chemical sold three herbicides that could control the weeds in his milo field. Those were 2,4D, Buctril, and Banvel. The herbicide dealer informed Simons that both Buctril and Banvel were fairly safe to use with regard to potential damage to neighboring fields, but they were four times more expensive that 2,4D. Walters instructed Simons to purchase the 2,4D. Simons further testified that when planning to apply herbicide with a ground applicator on another field on which coastal grasses grew, Walters selected the safer, more expensive Banvel, instead of 2,4D because it was near his own alfalfa fields which would be susceptible to the stronger herbicide. Simons testified that on May 14th, the wind did cause him some concern. Simons directed Lindeman to make a final pass over a fence line in order to hit the sunflower growing in the fence line. Simons also stated he had the right to stop Lindeman's application at any time. That is some evidence to support a jury finding of 30% liability, which will defeat a no-evidence issue. Appellant Walters' second issue is overruled.

### DAMAGES

Walters' third issue and Lindeman's fourth issue attack the sufficiency of the evidence concerning the projected yield of the damaged cotton crop. They argue that Foust and McDaniel Farms' reliance on historical data from the Agricultural Stabilization and Conservation Service (ASCS) as a base figure for calculating lost yields is not a reliable predictor of future yields. Walters argues that the ASCS projection of yields was intended to be used to establish the allotment of acres planted in cotton that would be eligible for agricultural subsidies, not for calculating lost profits, thus this evidence was irrelevant for this purpose. He further argues that it was unreliable because there are many variables on a year-to-year basis

that affect crop yield. Lindeman also argues that this was not the "best evidence" and should have been excluded. *See Gulf Coast Investment Corp. v. Rothman,* 506 S.W.2d 856, 858 (Tex.1974).

Recovery of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *See Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 85 (Tex.1992). Foust and McDaniels presented their evidence of projected crop yields through a retired ASCS agent, Charles Henson, who testified to the accuracy of the agency's data. He further reviewed with the jury the post–1990 data on the affected fields and calculated damage figures. He stated that he was unaware of a more accurate system for establishing such losses. The use of this data was reinforced by another of their experts, Wally Jones, who agreed that the best evidence was before the jury. The ASCS figures presented to the jury for purposes of calculating lost profits amounted to a "running average" of production on specific fields. The figures were compiled from reports from the annual reports of the acreage and production from cotton crops submitted by farmers and gin operators. The agency then took the most recent five years of data, deleted the highest and lowest production years, and calculated an average of the remaining three years to get what it was known as the ASCS predicted yield. In 1990, the ASCS stopped compiling this data, nevertheless, cotton farmers continued to submit their data to ASCS after that date. Actual historical production yields on the particular fields at issue may not have been available because (1) the plaintiffs had only been farming some of these fields since 1985, and added fields in 1988, 1991, and 1992; (2) Foust merely relied on McDaniel Farms' calculations, and (3) the expert called the calculations "close" which Lindeman argues is not reliable enough. Lindeman complains of inaccuracy and unreliability because the base figure is from 1990. It does not

appear that defendant-appellants attempted to offer their own calculations as more accurate—relying instead on the fact that this was plaintiffs' burden. We find that to the extent evidence supporting the damage award was not controverted, it is sufficient. To the extent defendants did offer controverting evidence, the matter is a fact question which was decided by the jury. Walter's third and Lindeman's fourth issues are overruled.

## GATE-KEEPING ON PROJECTED CROP YIELDS

In a supplemental brief, Walters further develops the previously asserted argument that the trial court erred in overruling defendants' objections to the use of ASCS records as a basis for calculating lost profits. They objected to farmer Bobby R. McDaniel's testimony as to projected yields because (1) the records were not intended to be the basis of lost profit calculations, and (2) the data had not been subjected to peer review and was, therefore, unreliable and inadmissible under *Daubert* and *Robinson.* Defendants also objected that the method used by McDaniels to calculate the amount of lost production was unscientifically reliable and not relevant. Defendants complain that the trial court erred in overruling these objections without first holding a "gate-keeping" hearing.

 There are a legion of cases that state one need not have a particular scientific background to testify about value. This court is among them:

> Anyone who says that he is familiar with the value of a specific piece of property, particularly an owner of it, may testify as to its value. *Brown v. Brown,* 520 S.W.2d 571, 577 (Tex.Civ.App.-Houston [14th Dist.] 1975, writ dism'd). The strength or weakness of the qualifications of a witness testifying to value goes to the weight to be given to the testimony, not its admissibility. · *Cortez v. Mascarro,* 412 S.W.2d 342, 343 (Tex. Civ.App.-San Antonio 1967, no writ). A trial court's admission of such testimony

will not be disturbed unless it was clearly erroneous. *Webb v. Mitchell,* 371 S.W.2d 754, 760 (Tex.Civ.App.-Houston 1963, no writ).

· *Rio Grande Land & Cattle Co. v. Light,* 749 S.W.2d 206, 212 (Tex.App.-San Antonio), *rev'd on other grounds,* 758 S.W.2d 747 (Tex.1988).

 The defendants also objected to the methodology utilized by Wally Jones, an agricultural economist. The trial court overruled the objection and allowed Jones to testify. Jones, who has a Ph.D. in agricultural accounting and has been on the Texas A & M faculty for 30 years, explained to the jury the process involved in calculating crop losses generally relies upon historical data. He also discussed other ways the plaintiffs might have attempted to estimate damages, such as comparing the production from neighboring fields. However, he felt the best approach was to use historical data and had relied on this method on several other similar cases for determining projected yields. We find no error in this ruling.

## CONCLUSION

The judgment notwithstanding the verdict is reversed in part and McDaniel Farms shall recover $162,976.00 and Foust shall recover $81,488.00 in actual damages. The judgment nothwithstanding the verdict is affirmed in all other things including the tolling of pre-judgment interest from December 11, 1996 to November 3, 1997. The costs of appeal shall be borne by the party incurring same.