**Joyce and Bruce PARKER, Appellants,**

v.

**THREE RIVERS FLYING SERVICE, INC. and Harold Griffith Flying Service, Inc., Appellees.**

**No. 11–05–00220–CV.**

Court of Appeals of Texas, Eastland.

March 1, 2007.

---

Ronald Chase McCallum, Ted B. Lyon & Associates, P.C., Mesquite, for appellants.

Geffrey W. Anderson, Joel Pate Smyer, Guy H. Riddle, Jon W. Harrison, Anderson, Smyer, Riddle & Kuehler, L.L.P., Fort Worth, Robert B. Wagstaff, Wagstaff & Watson, P.C., Abilene, for appellees.

Panel consists of: WRIGHT, C.J., Justice McCALL, J., and STRANGE, J.

## OPINION

TERRY McCALL, Justice.

Joyce and Bruce Parker brought this personal injury action against the Texas Boll Weevil Eradication Foundation, Inc.; Three Rivers Flying Service, Inc.; and Harold Griffith Flying Service, Inc. The Parkers' claims arose in connection with aerial pesticide applications. In an earlier accelerated appeal, this court upheld the trial court's order dismissing the Foundation from the suit on sovereign immunity grounds.[1] In this appeal, the Parkers contend that the trial court erred in granting Three Rivers's and Harold Griffith's motions for summary judgment. We affirm.

### Background

The Texas Legislature has recognized that the insects known as the boll weevil and the boll worm are menaces to the Texas cotton industry and that their eradication is a matter of public necessity. *See* TEX. AGRIC. CODE ANN. § 74.101 (Vernon Supp.2006). The legislature has designated the Foundation, a nonprofit corporation, as the entity to plan, carry out, and operate eradication programs to eliminate these insects. *See* TEX. AGRIC. CODE ANN. § 74.1011 (Vernon 2004). In an effort to eradicate these insects, the Foundation employs aerial sprayers, such as Three Rivers and Harold Griffith, to disperse insecticides on cotton crops. The Foundation entered into contracts with Three Rivers and Harold Griffith for the aerial application of the insecticide malathion. Under the contracts, Three Rivers and Harold Griffith are independent contractors of the Foundation. *See Parker v. Tex. Boll Wee-*

*vil Eradication Found., Inc.*, No. 11–04–00085–CV, 2005 WL 309562, *4 (Tex.App.-Eastland, Feb. 10, 2005, pet.denied).

This cause involves two separate aerial applications. The Parkers alleged that on June 7, 2001, Three Rivers was negligent in performing an application of malathion and that on September 19, 2003, Harold Griffith was negligent in performing an application of malathion. The Parkers also alleged that Joyce Parker was exposed to malathion as a result of the negligence and that she suffered personal injuries as a result of the exposures.

On December 24, 2003, Harold Griffith filed a no-evidence motion for summary judgment. In the motion, Harold Griffith asserted that there was no evidence that it was negligent in performing the aerial application in question and that there was no evidence that the alleged exposure to malathion caused any injury or damages to the Parkers. On January 9, 2004, Three Rivers filed a traditional motion for summary judgment and a no-evidence motion for summary judgment. In the no-evidence motion, Three Rivers asserted that there was no evidence (1) that it was negligent in performing the aerial application in question, (2) that it breached any duty to the Parkers, and (3) that it caused the Parkers' alleged damages. In the traditional motion, Three Rivers asserted that it was entitled to sovereign immunity. On March 11, 2004, the trial court entered an order staying and abating this cause pending the resolution of the Parkers' accelerated appeal against the Foundation. The abatement order provided that matters contrary to the abatement could be conducted by a Rule 11 agreement between the parties. *See* TEX.R. CIV. P. 11. On June 2, 2005, during the abatement period, the trial court entered its order granting

1. *See Parker v. Tex. Boll Weevil Eradication Found., Inc.*, No. 11–04–00085–CV, 2005 WL
309562 (Tex.App.-Eastland, Feb. 10, 2005, pet.denied).

summary judgment to Three Rivers and to Harold Griffith. The trial court's order granting summary judgment did not specify the ground or grounds relied on for its ruling.

## Issues Presented

The Parkers present five issues for review. In their first three issues, the Parkers contend that the trial court erred in granting summary judgment for the following reasons: (1) the abatement order precluded the trial court from ruling on the motions for summary judgment during the abatement period; (2) the doctrine of res ipsa loquitur precluded summary judgment; and (3) the summary judgment evidence raised fact issues on their claims. In their fourth issue, the Parkers assert that the trial court erred in granting summary judgment to the extent it granted summary judgment on sovereign immunity grounds. In their fifth issue, the Parkers contend that Three Rivers and Harold Griffith waived their objections to the summary judgment evidence by failing to obtain a written ruling on the objections.

## Abatement Issue

■ The Parkers argue that the trial court's order granting summary judgment was void and a legal nullity because the trial court signed the order during the abatement period. The Parkers rely on *In re Kimball Hill Homes Texas, Inc.*, 969 S.W.2d 522, 527 (Tex.App.-Houston [14th Dist.] 1998, no pet.), and *Lumbermens Mutual Casualty Co. v. Garza*, 777 S.W.2d 198, 199 (Tex.App.-Corpus Christi 1989, no pet.). These cases stand for the proposition that the abatement of a case precludes the trial court from going forward on the case and prohibits the parties from proceeding in any manner in the case until the case has been reinstated. *Kimball Hill*

*Homes*, 969 S.W.2d at 527; *Garza*, 777 S.W.2d at 199. The courts in these cases recognized that the trial court has discretion in drafting abatement orders to allow the court and the parties to proceed on matters as specified in the abatement order. *Kimball Hill Homes*, 969 S.W.2d at 527 ("Unless otherwise specified in the abatement order, any action taken by the court or the parties during the abatement is a legal nullity."); *Lumbermens*, 777 S.W.2d at 199 ("Of course, a trial court may, in its discretion, draft an abatement order which would allow the parties to file discovery requests.").

In this cause, the trial court's abatement order related to the Parkers' accelerated appeal against the Foundation. The order provided that all deadlines and trial settings were to be held in abeyance pending the resolution of the appeal between the Parkers and the Foundation. The order also specifically provided that "[a]dditional matters contrary to this Order may be conducted by Rule 11 agreement between all of the parties." Therefore, the language in the order clearly allowed the trial court and the parties to proceed with the motions for summary judgment "by Rule 11 agreement." Based on the reasoning in *Kimball Hill Homes* and *Lumbermens*, the trial court had the discretion to draft the abatement order in this fashion. *Kimball Hill Homes*, 969 S.W.2d at 527; *Garza*, 777 S.W.2d at 199.

An agreement may comply with Rule 11 in either of two ways: (1) be in writing, signed, and filed with the papers as part of the court's record or (2) be made in open court and entered of record. *See* Rule 11; *Breceda v. Whi*, 187 S.W.3d 148, 153 (Tex. App.-El Paso 2006, no pet.). The record in this cause supports the conclusion that the Parkers' counsel agreed to go forward on

the motions for summary judgment.[2] However, the record does not contain an agreement on the issue complying with Rule 11.

■ The Parkers did not object in the trial court to proceeding with the hearing on the motions for summary judgment.[3] They did not assert that the lack of a Rule 11 agreement prohibited the trial court and the parties from proceeding with the motions. To preserve a complaint for appellate review, a party must present to the trial court a timely, specific request, objection, or motion. TEX.R.APP. P. 33.1(a). By failing to object on the basis of a lack of a Rule 11 agreement in the trial court, the Parkers failed to preserve error on the abatement issue for appeal. *Id.* We overrule the Parkers' first issue.

*Summary Judgment Issues*

■ Three Rivers and Harold Griffith moved for summary judgment on multiple grounds, including the ground that there was no evidence that they were negligent in performing the aerial applications in question. The trial court granted Three Rivers's and Harold Griffith's motions for summary judgment without specifying the ground or grounds upon which it relied in granting the motions. When a trial court's order granting summary judgment does not specify the ground or grounds relied upon for its ruling, summary judgment will be affirmed on appeal if any of the summary judgment grounds advanced by the movant are meritorious. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989).

■ We must review a no-evidence summary judgment under the same standard as a directed verdict. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex.2003). Accordingly, we examine the record in the light most favorable to the nonmovant and disregard all contrary evidence and inferences. *Id.; Wal–Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex.2002). A trial court must grant a proper no-evidence motion for summary judgment unless the nonmovant produces more than a scintilla of probative evidence to raise a genuine issue of material fact. TEX.R. CIV. P. 166a(i); *Wal–Mart*, 92 S.W.3d at 506.

*The Summary Judgment Evidence*

Stephen L. Moreno performed the June 7, 2001 aerial pesticide application while he

---

2. The record shows that the parties proceeded with various matters during the abatement period. On April 29, 2004, the parties deposed the Parkers' designated liability expert. On July 19, 2004, the Parkers filed supplemental summary judgment evidence in opposition to Three Rivers's and Harold Griffith's motions for summary judgment. Three Rivers and Harold Griffith both state in their appellate briefs that counsel for the parties, including the Parkers' counsel, agreed to go forward with a hearing on the motions for summary judgment and that, on November 8, 2004, the trial court held a hearing on the motions. This court has received correspondence from the court reporter indicating that there was no reporter's record for the November 8, 2004 hearing. Thus, there is no reporter's record of the hearing in the appellate record. However, the Parkers have not denied (1) that their counsel agreed to go forward with the November 8, 2004 hearing on the motions for summary judgment, (2) that the trial court heard the motions on November 8, 2004, or (3) that their counsel participated in the hearing.

3. The Parkers did not raise the abatement issue in the trial court until after the trial court entered the summary judgment order. The Parkers raised the abatement issue in a June 6, 2005 letter to the trial court. In the letter, the Parkers asserted that any ruling by the trial court during the abatement period was void and a legal nullity and that, therefore, the trial court's summary judgment order was void. The Parkers did not raise the issue of a lack of a Rule 11 agreement in the June 6, 2005 letter.

was in the course and scope of his employment with Three Rivers. Terrie Bradley, an employee for the Foundation, observed the June 7, 2001 application from the Parkers' driveway. Bradley is referred to in the record as a ground observer for the Foundation. During the application, Moreno sprayed two adjacent cotton fields that were near the Parkers' property and house. The Parkers filed the depositions of Moreno and Bradley as summary judgment evidence.

Moreno said that aerial applications may be made only when the wind speed is under ten miles an hour. He also said that applications should not be made if the wind speed is over ten miles an hour because of the potential for off-target drift of the pesticide to adjacent properties. Thus, Moreno testified that a reasonably prudent applicator should not make an application if the wind is above ten miles an hour. Bradley also testified that applications should not be performed if the wind is over ten miles an hour. Moreno also testified that, if wind speed rises to over ten miles an hour during an application, the application is aborted.

Moreno testified in detail about the June 7, 2001 application. Moreno performed the application during the afternoon hours. He said that the winds were very light that day. He testified that the treated fields were about three hundred to four hundred feet away from the Parkers' house. Moreno said that, before he left the airport to perform the application, he inspected the airplane to make sure that it was safe for flight and also checked the spraying equipment on the airplane. Moreno testified that Bradley, the ground observer, monitored the winds at the subject fields and made sure that the fields were clear of people.

Moreno and Bradley had direct radio contact with each other before and during the application. Moreno said that he relied on Bradley to tell him wind speeds. Moreno testified that Bradley told him the wind was blowing less than ten miles an hour. Moreno flew the airplane to the fields to perform the application. Bradley testified that she made sure the fields were clear of people and that the wind conditions were appropriate for the application. Bradley monitored the wind speed with a wind meter. Bradley testified that the wind speed was appropriate for the application. The record shows that Bradley recorded the wind speed at seven miles an hour.

When Moreno arrived at the subject fields, he circled the fields to examine them for obstructions, people, and high lines. Moreno determined that everything was clear and also determined the safest path for performing the application. Moreno testified that he confirmed with Bradley that the wind speed was still appropriate for the application. Moreno said that the wind was blowing in the direction of the Parkers' house.

Moreno performed the application while flying the airplane about three to four feet above the cotton canopy. Moreno testified that the safest way to make the application included flying over the Parkers' house. He said that he flew over their house about six times. He testified that he did not spray the Parkers' house with malathion. He also testified that he left a buffer zone in between where he stopped spraying in the fields and the Parkers' house. Moreno said that the wind speed never exceeded ten miles an hour during the June 7, 2001 application.

Bradley testified that, during the application, she was located between the Parkers' house and the fields that were being sprayed. She also testified that the fields were across a road from the Parkers' house and that the fields were probably

300 feet or more away from their house. She said that she did not see any evidence of a drift during the application. She also said that she neither saw any signs of a chemical in the air nor smelled any chemical in the air.

Joyce Parker testified that she heard the airplane fly over her house during the June 7, 2001 application. She said that, for an hour or more, the airplane was flying over her house and turning around over the house. She also said that she stayed inside the house during the application and that she did not witness any of the application.

The Parkers also submitted as summary judgment evidence test results from a vegetative sample taken from their property on June 8, 2001. The sample showed the presence of malathion.

Harold Griffith performed the September 19, 2003 application. There is no testimony from Griffith or a Foundation ground observer in the summary judgment record. The Parkers submitted summary judgment evidence showing that Griffith performed an aerial pesticide application in a cotton field about 5.2 miles north of Big Spring on September 19, 2003. With respect to this application, the Parkers alleged that they were traveling on a highway near the field that Griffith was treating. In an affidavit, Bruce Parker stated that, as they were traveling on the highway, "Harold Griffith flew over the highway and sprayed our vehicle with the poison they use to kill the boll weevil." The Parkers also submitted test results from a sample taken from their windshield showing the presence of malathion.

The Parkers presented the deposition testimony of Paul E. Sumner, their designated liability expert, in opposition to the motions for summary judgment. Sumner testified that he was an extension agricultural engineer with the University of Geor-gia. He was not a licensed pilot or an aerial applicator. His testimony primarily focused on the June 7, 2001 application. He testified that the June 7, 2001 application did not involve a direct spraying from the Three Rivers's airplane onto the Parkers' property. Rather, Sumner testified that the application involved a "drift" of the malathion. Sumner said that, when the Parkers' counsel contacted him, the Parkers' counsel asked him to look at information concerning a drift case. Sumner also said that this case did not involve any problem with the equipment used in the June 7, 2001 application.

Sumner testified that the potential for drift relates primarily to sustained wind speeds. He explained that an off-target drift results from the size of the buffer and the wind speed. He said that there is always some off-target movement when making an application. He also said that the applicable standard of care provides that applications be made with wind speed under ten miles per hour and that the standard of care is designed to keep drift to a minimum. Sumner testified that, if Moreno made the application with wind speed under ten miles an hour, he did not breach the standard of care as is set forth in Texas. Sumner testified that, based on the information that he had reviewed, Bradley said the wind speed was seven miles per hour and Bradley told Moreno the wind speed was seven miles per hour.

Sumner said that he believed the wind speed exceeded ten miles an hour during the June 7, 2001 application. Sumner said that the June 7, 2001 weather records for Lubbock, Midland, and Big Spring all indicated that the wind was blowing more than ten miles an hour. However, he also said that the wind speed in Lubbock, which was about eighty miles away from the application site, and that the wind speed in Midland, which was about forty miles away

from the application site, were not indicative of the actual wind speed at the application site. He said that Big Spring was about eighteen miles from the application site. Sumner agreed that wind speeds increase as you go higher in altitude. Sumner said that he did not know the altitude of the weather recording device at the Big Spring weather station. Moreno testified that the weather recording device at Big Spring sits on top of a hill. Sumner testified that the weather record for Big Spring showed an average wind velocity of 10.66 miles per hour on June 7, 2001, at 3:30 p.m.

Sumner identified other complaints that he had with Moreno's June 7, 2001 application. For example, Sumner said Moreno flew directly over the Parkers' house without giving them advance notice of the application. However, Sumner testified that he was unaware of any standard of care in Texas requiring an aerial applicator to give advance notice of an application. Sumner also testified that giving notice of an application has nothing to do with how far a pesticide will drift. Sumner also said that Moreno should have left a larger buffer zone in between where he stopped spraying and the Parkers' house. Sumner testified that 300 feet would have been an adequate buffer. However, Sumner did not know of any information promulgated by the Texas Department of Agriculture or any regulation promulgated by the Foundation requiring a 300–foot buffer. Sumner said that there was no Georgia regulation or federal regulation requiring a 300–foot buffer. After identifying his complaints about Moreno, Sumner testified that, if the evidence demonstrated that Moreno made the application with the wind speed under ten miles an hour and all other factors remained the same, Moreno did not breach the standard of care.

Sumner also testified about the September 19, 2003 aerial application. He said that the September 19, 2003 weather records for Big Spring showed wind speeds ranging anywhere from five miles per hour to a little more than seven miles per hour. Sumner said that he had reviewed the Parkers' depositions and records from the Texas Department of Agriculture. According to Sumner, the Parkers testified that, as they were traveling along, an airplane flew overhead and material appeared on their windshield. He also said that a sample taken from the windshield of the Parkers' vehicle showed malathion residue. Sumner testified that, as of the date of giving his deposition, he did not have enough information to determine whether Harold Griffith did anything wrong during the September 19, 2003 application. Sumner also testified that he did not have enough information to determine whether the application involved a direct spraying of the windshield, as opposed to an off-target drift. Sumner said that he needed to know the size of the buffer zone that Griffith used during the application.

During questioning by the Parkers' counsel, Sumner testified that it is a breach of the standard of care if you spray a person or a person's yard with poison. He also testified that it is a breach of the standard of care if you spray poison onto the windshield of a car that is traveling on the highway.

### Does Res Ipsa Loquitur Apply?

In their second issue, the Parkers argue that the doctrine of res ipsa loquitur applies to their claims and that, therefore, the trial court erred in granting summary judgment. Res ipsa loquitur means "the thing speaks for itself" and applies "in certain limited types of cases when the circumstances surrounding the accident constitute sufficient evidence of

the defendant's negligence to support such a finding." *Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex.1990). The res ipsa loquitur doctrine applies only when two factors are proved: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. *Id.* Res ipsa loquitur is not a separate cause of action for negligence; instead, it is a rule of evidence by which negligence may be inferred by the jury. *Id.*

The Parkers rely on *Farm Services, Inc. v. Gonzales*, 756 S.W.2d 747 (Tex.App.-Corpus Christi 1988, writ denied). In *Gonzales*, pesticide was suddenly and unexpectedly discharged from an airplane while an aerial applicator was en route to treat an orchard. *Id.* at 749. The pesticide fell onto the plaintiff as he was working on a farm. *Id.* The discharge of the pesticide in *Gonzales* occurred as a result of a defect or a problem with the airplane's sprayer system. *Id.* In determining whether res ipsa loquitur applied, the *Gonzales* court explained that "the sudden discharge of a large amount of concentrated, toxic pesticide by a crop-dusting airplane en route to its destination is an event which ordinarily would not occur in the absence of negligence." *Id.* at 752. The court also explained that the defendants had management and control over the airplane's sprayer mechanism. *Id.* Therefore, the court held that res ipsa loquitur applied and that the application of res ipsa loquitur supported the jury's negligence findings. *Id.*

■ This cause is distinguishable from *Gonzales*. *Gonzales* involved the sudden and unexpected discharge of pesticide resulting from a defect or failure in an airplane's spraying equipment while the aerial applicator was en route to treat an orchard. Unlike *Gonzales*, this cause does not involve a defect or failure of the airplane's equipment. Rather, this cause involves the judgments, techniques, and skill the aerial applicators used in performing the applications. The primary issue in this cause is whether the aerial applicators breached the applicable standard of care during the applications. Sumner testified that there is always some off-target movement of pesticide when making an application and that the applicable standard of care is designed to keep drift to a minimum. This testimony established that drifts of pesticide occur in the absence of negligence. Because some drift occurs in every application, the Parkers cannot establish that the character of the alleged accident—the drift of pesticide—does not ordinarily occur in the absence of negligence. The Parkers presented no summary judgment evidence that the drift of pesticide does not ordinarily occur in the absence of negligence. Therefore, we find that the doctrine of res ipsa loquitur does not apply in this cause. We overrule the Parkers' second issue.

*Expert Testimony Requirement*

The facts in this cause are similar to those addressed in *Hager v. Romines*, 913 S.W.2d 733 (Tex.App.-Fort Worth 1995, no pet.). In *Hager*, an aerial applicator applied herbicide to a field nearby the plaintiffs' property. *Id.* at 734. On the date of the application, the plaintiffs noticed damage to their plants. *Id.* In a suit against the aerial applicator, the plaintiffs claimed that the aerial applicator had been negligent in applying the herbicide to the nearby field and that their plants had been damaged as a result of the negligence. *Id.* The *Hager* court held that expert testimony was necessary to establish the standard of care in the aerial application of herbicide and the breach of the standard of

care. *Id.* at 734–35. The court explained the rationale for its holding:

Expert testimony is necessary when the alleged negligence is of such a nature that it is not within the experience of a layman. *Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982). Not only is flying an airplane not within the realm of experience of the ordinary, prudent person or juror, applying herbicide and pesticide aerially requires use of specialized equipment and techniques that are not familiar to the ordinary person.

*Id.* at 735; *see also Foust v. Estate of Walters,* 21 S.W.3d 495, 505 (Tex.App.-San Antonio 2000, pet. denied) (a negligence claim against an aerial applicator must be established with expert testimony).

■ We agree with the sound reasoning of the *Hager* court. Therefore, we hold that the Parkers were required to establish with expert testimony the applicable standard of care and breach of the standard of care. The Parkers attempt to distinguish *Hager* from this cause because *Hager* involved a pesticide drift that damaged crops and not a pesticide drift that caused injury to people. However, the reasoning of *Hager* applies equally to personal injury and property damage cases.

*Did the Summary Judgment Evidence Raise a Fact Issue?*

■ In their third issue, the Parkers assert that the trial court erred in granting the no-evidence motions for summary judgment because they raised fact issues in response to the motions. In their brief, the Parkers assert that Sumner's expert testimony raised fact issues as to whether Three Rivers and Harold Griffith breached the standard of care in the following ways: (1) by spraying the Parkers' property with poison; (2) by spraying Joyce Parker with poison; (3) by spraying the windshield of the Parkers' car with poison; (4) by flying in winds that exceeded ten miles an hour; and (5) by failing to notify the Parkers of the aerial application.

With respect to the first three breaches listed above, the Parkers rely on Sumner's testimony (1) that it is a breach of the standard of care if you spray a person or a person's yard with poison and (2) that it is a breach of the standard of care if you spray poison onto the windshield of a car that is traveling on the highway. However, Sumner did not testify that Three Rivers directly sprayed the Parkers' property or Joyce Parker with malathion or that Harold Griffith directly sprayed the windshield of the Parkers' car with malathion. Rather, Sumner testified that the Three Rivers application involved an off-target drift, as opposed to a direct spraying. Sumner also testified that he did not have enough information to determine whether the Harold Griffith application involved a direct spraying. Thus, the Parkers did not present expert testimony that Three Rivers or Harold Griffith directly sprayed them or their property with malathion. In the absence of such testimony, the Parkers failed to raise fact issues on the first three breaches listed above.

Next, the Parkers contend that Sumner's testimony raised a fact issue as to whether Three Rivers's pilot, Moreno, breached the standard of care by flying in winds that exceeded ten miles an hour. Sumner testified that, if Moreno made the application with wind speed under ten miles an hour, he did not breach the standard of care as is set forth in Texas. The summary judgment evidence showed that Bradley recorded the wind speed at seven miles an hour and that Bradley told Moreno the wind speed was seven miles per hour. Sumner testified that, based on the weather records for Lubbock, Midland, and Big Spring, he believed the wind speed exceeded ten miles an hour during

Moreno's application. However, Sumner testified that the wind speeds in Lubbock and in Midland were not indicative of the actual wind speed at the application site. The weather records for Big Spring showed an average wind velocity of 10.66 miles per hour on June 7, 2001, at 3:30 p.m. Sumner said that wind speeds increase as altitude increases and that he did not know the altitude of the weather recording device in Big Spring. Moreno testified that the weather recording device at Big Spring sits on top of a hill. Although Sumner believed the wind speed exceeded ten miles an hour at the application site, the Parkers presented no summary judgment evidence showing that the wind speed was above ten miles an hour at the application site. Therefore, the Parkers presented no evidence that Moreno performed the application in wind exceeding ten miles an hour.

Likewise, there was no summary judgment evidence that the wind speed exceeded ten miles an hour during Harold Griffith's aerial application. Sumner testified that the September 19, 2003 weather records for Big Spring showed wind speeds ranging anywhere from five miles per hour to a little more than seven miles per hour.

The Parkers also assert that Moreno breached the standard of care by failing to notify them of the application. Although Sumner testified that Moreno should have notified the Parkers of the application, he also testified that he was unaware of any standard of care in Texas requiring an aerial applicator to give advance notice of an application. Therefore, Sumner's testimony provided no evidence that such a standard of care exists in Texas. Additionally, Sumner further testified that giving notice of an application has nothing to do with how far a pesticide will drift.

Sumner also testified that Moreno should have left a larger buffer zone in between where he stopped spraying and the Parkers' house. Sumner said that a 300-foot buffer would have been adequate. However, Sumner also said that he did not know of any information promulgated by the Texas Department of Agriculture or any regulation promulgated by the Foundation requiring a 300-foot buffer. Sumner's testimony provided no evidence that a standard of care exists in Texas requiring a 300-foot buffer zone.

Sumner testified that, if the evidence demonstrated that Moreno made the application with wind speed under ten miles an hour, and all other factors remained the same, Moreno did not breach the standard of care. There was no summary judgment evidence that the wind speed exceeded ten miles an hour at the application site. The Parkers failed to meet their summary judgment burden of establishing with expert testimony that Moreno breached the applicable standard of care. Sumner also testified that he did not have enough information to determine whether Harold Griffith did anything wrong during the September 19, 2003 application. The Parkers failed to meet their summary judgment burden of establishing with expert testimony that Harold Griffith breached the applicable standard of care.[4]

4. The Parkers cite *Lauderdale v. Texas Department of Agriculture*, 923 S.W.2d 834 (Tex. App.-Austin 1996, no pet.), in arguing that the summary judgment evidence raised a fact issue on their negligence claim against Harold Griffith. *Lauderdale* involved a judicial review of an administrative penalty against an aerial applicator. *Id.* at 836–37. The issue in *Lauderdale* was whether the aerial applicator had exposed motorists to pesticide on a certain date. *Id. Lauderdale* did not involve a negligence claim against the aerial applicator. Therefore, the issue of the type of evidence necessary to establish a breach of the standard of care was not before the court.

The Parkers failed to raise a fact issue on whether Three Rivers and Harold Griffith breached the standard of care. Therefore, the trial court did not err in granting Three Rivers's and Harold Griffith's no-evidence motions for summary judgment. We overrule the Parkers' third issue.

*Parkers' Other Issues*

Based on our disposition of the Parkers' first three issues, we need not address their fourth issue (that the trial court erred to the extent it granted summary judgment on sovereign immunity grounds). TEX.R.APP. P. 47.1. With respect to the Parkers' fifth issue (that Three Rivers and Harold Griffith waived their objections to the summary judgment evidence by failing to obtain a written ruling on the objections), we note that we did not consider any of the objections in our review of the record. Otherwise, we do not address the Parkers' fifth issue.

*This Court's Ruling*

We affirm the judgment of the trial court.